No. 98,017

STATE OF KANSAS, *Appellee,* v. BENJAMIN A. APPLEBY,
*Appellant.*
(221 P.3d 525)

1018

1019

1020

Opinion filed November 20, 2009.

*Debra J. Wilson*, of Capital and Conflicts Appellate Defender Office, argued the cause and was on the briefs for appellant.

*Steven J. Obermeier*, assistant district attorney, argued the cause, and *Phill Kline*, district attorney, and *Steve Six*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

LUCKERT, J.: Benjamin A. Appleby was convicted of the attempted rape and capital murder of A.K., a 19-year-old college student, in Johnson County, Kansas.

The following issues are raised on appeal: (1) Are Appleby's convictions of capital murder and attempted rape multiplicitous, meaning his sentences for both convictions result in a double jeopardy violation? (2) Did the trial court violate Appleby's right against self-incrimination by admitting into evidence custodial statements made after Appleby had asked, while being booked on a different case, whether he would be able to talk to an attorney? (3) Did the trial court violate Appleby's right to confrontation by admitting into evidence a computer-generated report regarding population statistics related to DNA testing? (4) Did the trial court err by giving a jury instruction containing an expanded definition of "premeditation"? (5) Did the trial court abuse its discretion in weighing aggravating and mitigating circumstances in determining whether to impose the hard 50 sentence? and (6) Is the hard 50-sentencing scheme unconstitutional under *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000)?

On review, we agree with Appleby's arguments regarding issue one, hold that his attempted rape conviction is multiplicitous with his capital murder conviction, and vacate the sentence imposed for the attempted rape conviction. However, we affirm Appleby's conviction and sentence for capital murder, finding that Appleby failed to establish error resulting from any of the complaints raised in issues two through six.

## FACTUAL AND PROCEDURAL BACKGROUND

On June 18, 2002, A.K. was murdered while working alone as an attendant at a swimming pool near her family's home. Her brother, who also worked as a pool attendant, arrived at the pool around 5 p.m. to relieve A.K. after her shift ended, but he could not find her. He called their father, R.K., who came to the pool and searched for his daughter. Around 5:30 p.m., R.K. found A.K. in the pool's pump room, lying face down under a pool cover. She had been severely beaten, her face was battered and bloody, and

her hair was matted with blood. A.K. was naked from the waist down, her sports bra had been pushed up under her arms, and her T-shirt was wrapped tightly around her neck.

Soon after this tragic discovery, police arrived and secured the pool area. In doing so, an officer recorded the name of everyone present at the scene, including a "Teddy Hoover" who was later identified as Appleby. The police also secured evidence, some of which was tested for DNA. This testing revealed DNA that did not match A.K.'s. Few other leads developed from the initial investigation.

An autopsy led to the conclusion that A.K.'s death was caused by strangulation and multiple blunt force injuries, although the strangulation would have been enough to kill A.K. Dr. Michael Handler—the forensic neuropathologist who performed the autopsy and who is board certified in anatomic pathology, neuropathology, and forensic pathology—concluded there had been both ligature and manual strangulation. According to him, it would have taken approximately 10—and perhaps as many as 16—minutes for the assailant to strangle A.K. Because there was petechial hemorrhaging, Dr. Handler believed there were periods when the force of strangulation was stopped.

Dr. Handler also identified other injuries, which made it appear A.K. had been in a horrible fight. Both of her eyes were blackened, her lip was cut, and her arms were bruised and scraped. A.K.'s hands, especially the knuckles and fingers, were cut, and the fingers on her left hand were contorted and broken. A.K. also had bruises on her face and both hip bones, knees, feet, and upper thighs. There were two lacerations on the back of A.K.'s head, which could have been caused by a fall or by someone beating her head against the floor.

Several months after A.K.'s death, Sergeant Scott Hansen of the Leawood Police Department went to Appleby's home in Kansas City, Kansas. At that point in time, the police knew Appleby by his alias of Teddy Hoover. Appleby agreed to speak with Sergeant Hansen and indicated that he was a self-employed pool maintenance contractor. Hansen requested a DNA elimination sample from Appleby, who said he would talk to his attorney about pro-

viding a sample. When Hansen tried to follow up later, he discovered that Appleby had left town.

Subsequent leads caused police to seek more information from Appleby, who they still knew as Teddy Hoover. In November 2004, the investigation led Kansas detectives to Connecticut, where Appleby was living. Connecticut State Police discovered an outstanding arrest warrant for Appleby from 1998 and agreed to execute the warrant when Kansas detectives could be present. The purpose of this arrest was to give Kansas detectives an opportunity to question Appleby.

After Kansas detectives arrived in Connecticut, they worked with Connecticut officers to prepare and obtain search warrants that authorized a search of Appleby's house and the swabbing of Appleby's mouth for the purpose of obtaining a DNA sample. Then, Connecticut police arrested Appleby at his home and executed the residential search warrant.

While the search warrant was being executed, Appleby was transported to a nearby Connecticut police station by Connecticut Detective Daniel Jewiss. On the way, Appleby volunteered that after some "trouble" in his past, he had taken on the name of his childhood friend, Teddy Hoover, who had died in an accident.

At the police station, Detective Jewiss started processing Appleby on the Connecticut arrest warrant. During the book-in process, another detective from Connecticut's major crime unit executed the search warrant that allowed swabbing Appleby's inner mouth for purposes of DNA testing. As we will discuss in more detail as part of our analysis of the second issue, when served with the DNA search warrant Appleby asked if he could speak to an attorney regarding his right to refuse the swabbing and, at three other points during the book-in process, asked whether he would have a chance to talk to an attorney. Appleby was told he did not have a right to refuse the execution of the warrant allowing the DNA swabbing but was told he would have the opportunity to call an attorney.

After completing most of the book-in process, Detective Jewiss told Appleby that other detectives wanted to speak to him about "an unrelated matter" and asked if Appleby was willing to talk to

them. Appleby agreed and was taken upstairs to an interrogation room where the Kansas detectives waited. The detectives asked Appleby if he would answer some questions about A.K.'s murder. Up to this point, Appleby had not been told that Kansas detectives were involved or that some of the warrants were related to the A.K. murder investigation.

Appleby told the Kansas detectives he wanted to speak with them and straighten out some details from the time Sergeant Hansen interviewed him at his home in Kansas City. After being *Mirandized*, Appleby told the Kansas detectives that while he lived in Kansas City he used the name Teddy Hoover and had a pool company named Hoover Pools. Appleby indicated that he moved to Texas shortly after his interview with Sergeant Hansen and went back to using his real name, Benjamin Appleby; then he moved to Connecticut.

The detectives repeatedly asked Appleby if he had been at the pool where A.K. died, but Appleby told them he had never been there. After approximately 1 hour, the detectives moved him to an adjoining interview room. The second room contained items from the police investigation, such as a time line of the investigation, A.K.'s photograph and obituary, an aerial photograph of the pool, a videotape, a notebook labeled with the name Teddy Hoover, and two additional notebooks labeled as crime scene and autopsy photographs. The detectives then confronted Appleby with the fact that an officer at the pool on the day of the murder had logged the presence of a man who gave the name Teddy Hoover and a telephone number. At that point, Appleby acknowledged he had been at the pool that day.

About 15 or 20 minutes later, Appleby admitted he had killed A.K. Appleby told the detectives A.K. was in the pump room when he arrived at the pool. Finding A.K. attractive, Appleby tried to "hit on her," but A.K. rejected his advances and tried to leave the pump room. Appleby stood in her way and tried to grab her breasts and her waist. A.K. pushed Appleby and then punched him. This angered Appleby, who "lost it" and, in his own words, "just beat the shit out of her."

Appleby described the ensuing struggle during which the two fell and Appleby hit A.K. twice in the back of the head, which rendered her unconscious. Then he straddled A.K. and removed her shorts and panties, intending to have sex with her. Appleby next stood up and found a first-aid kit stored in the pump room. From the kit, the defendant said he took a tube of ointment and used the ointment as a sexual lubricant, but he could not obtain an erection.

Appleby also admitted to strangling A.K., although he told the detectives he could not remember what he used. At one point, Appleby suggested he used the rope on the pool thermometer in the pump room. At other times he stated he did not remember strangling A.K.

In describing what happened next, Appleby stated that as he was leaving, he thought he heard A.K. breathing and "didn't want to leave her that way," so he covered her up with the pool cover. He then left as a young woman drove up and honked a horn. He waved, got into his truck, and left. Appleby returned to the pool later, about 5:30 p.m., because he wanted to see what had happened; as a result, he was on the scene when the police created the crime scene log.

DNA testing performed by two crime labs matched Appleby's DNA to the DNA found mixed with A.K.'s DNA on the ointment tube and on her sports bra and T-shirt. In addition, Appleby was linked to the crime by the young woman who pulled up as Appleby was leaving the pool; she identified him as the man she saw.

The State charged Appleby with capital murder for the death of A.K. (Count I), under K.S.A. 21-3439(a)(4) (intentional premeditated killing in the commission of or subsequent to the offense of attempted rape), and attempted rape (Count II), under K.S.A. 21-3301 and K.S.A. 21-3502. The jury found Appleby guilty of both charges. The trial court imposed a hard 50 life imprisonment sentence for the murder conviction and a consecutive sentence of 228 months' imprisonment for the attempted rape conviction. Appleby now appeals.

After oral arguments before this court, an order was entered staying a decision pending the United States Supreme Court's decisions in two cases. The first, *Montejo v. Louisiana*, 556 U.S. __,

173 L. Ed. 2d 955, 129 S. Ct. 2079 (2009), which relates to Appleby's second issue regarding the admission of his confession, was filed on May 26, 2009. The second, *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 174 L. Ed. 2d 314, 129 S. Ct. 2527 (2009), which relates to Appleby's third issue regarding the admission of the DNA testing, was filed on June 25, 2009. Following each decision, Appleby filed letters of supplemental authority pursuant to Supreme Court Rule 6.09(b) (2008 Kan. Ct. R. Annot. 47), and this matter is now ready for decision pursuant to this court's jurisdiction under K.S.A. 22-3601(b)(1) (off-grid crime).

## ISSUE 1. MULTIPLICITY OF CAPITAL MURDER AND ATTEMPTED RAPE

Appleby's first issue on appeal is a multiplicity and double jeopardy objection that he first asserted in a pretrial motion to dismiss the attempted rape charge. In the motion, he argued the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution, § 10 of the Kansas Constitution Bill of Rights, and K.S.A. 21-3107 prohibit convictions on both counts alleged against him—*i.e.*, capital murder and attempted rape. The trial court set the motion to dismiss for hearing along with several other pretrial motions. Although a ruling on this motion is not contained in the record on appeal, presumably the motion was denied because the case proceeded on both counts. Because the issue is purely one of law, we are not hindered in our review by the absence of the ruling from the record on appeal.

### A. Standard of Review

When an appellate court reviews a ruling on a double jeopardy or multiplicity issue, an unlimited scope of appellate review applies. *State v. Thompson*, 287 Kan. 238, 243, 200 P.3d 22 (2009); *State v. Harris*, 284 Kan. 560, Syl. ¶ 3, 162 P.3d 28 (2007).

### B. Strict-Elements Test

In raising this issue before pretrial, Appleby argued the charges of attempted rape and capital murder based on the aggravating crime of attempted rape were multiplicitous.

" ' "Multiplicity is the charging of a single offense in several counts of a complaint or information. The reason multiplicity must be considered is that it creates the *potential* for multiple punishments for a single offense in violation of the Double Jeopardy Clause of the Fifth Amendment of the United States Constitution and section 10 of the Kansas Constitution Bill of Rights." ' [Citations omitted.]" *State v. Schoonover*, 281 Kan. 453, 475, 133 P.3d 48 (2006).

The procedural objection of multiplicity preserves a claim of double jeopardy, which arises when a defendant is actually sentenced twice for one offense. See *Schoonover*, 281 Kan. at 475. When analyzing a claim of double jeopardy,

"the overarching inquiry is whether the convictions are for the same offense. There are two components to this inquiry, both of which must be met for there to be a double jeopardy violation: (1) Do the convictions arise from the same conduct? and (2) By statutory definition are there two offenses or only one?" *Schoonover*, 281 Kan. at 496.

The State does not argue that the offenses were two acts of discrete conduct. Consequently, we accept that the convictions arose from unitary conduct and focus on the second inquiry of whether the conduct constituted one or two offenses by statutory definition.

When analyzing whether sentences relating to two convictions that arise from unitary conduct result in a double jeopardy violation, the test to be applied depends on whether the convictions arose from one or two statutes. If the double jeopardy issue arises from convictions for multiple violations of a single statute, the unit of prosecution test is applied. If the double jeopardy issue arises from multiple convictions of different statutes, in other words if it is a multiple-description issue, the strict-elements test is applied. *Schoonover*, 281 Kan. at 497.

Because Appleby raises a double jeopardy argument arising from his convictions under two different statutes, the strict-elements test applies to this analysis. The strict-elements test "serves as a rule of statutory construction to discern whether [a legislature] intended multiple offenses and multiple punishments" when a court is analyzing the claim under the Double Jeopardy Clause of the Fifth Amendment. *Schoonover*, 281 Kan. at 498. Similarly, when analyzing a claim under § 10 of the Kansas Constitution Bill of Rights,

"the same-elements test is applied to implement the legislative declaration in [K.S.A. 21-3107] that a defendant may be convicted of two crimes arising from the same conduct unless one is a lesser included offense of the other." *Schoonover*, 281 Kan. at 498. Finally, K.S.A. 21-3107 provides a statutory defense when charges arise from the "same conduct."

K.S.A. 21-3107 provides:

"(1) When the same conduct of a defendant may establish the commission of more than one crime under the laws of this state, the defendant may be prosecuted for each of such crimes. Each of such crimes may be alleged as a separate count in a single complaint, information or indictment.

"(2) Upon prosecution for a crime, the defendant may be convicted of either the crime charged or a lesser included crime, *but not both*. A lesser included crime is:

(a) A lesser degree of the same crime;

(b) *a crime where all elements of the lesser crime are identical to some of the elements of the crime charged*;

(c) an attempt to commit the crime charged; or

(d) an attempt to commit a crime defined under subsection (2)(a) or (2)(b)." (Emphasis added.)

## C. Application of Strict-Elements Test

Recently, in *Trotter v. State*, 288 Kan. 112, Syl. ¶ 1, 200 P.3d 1236 (2009), we applied these principles and K.S.A. 21-3107 to a defendant's argument that his premeditated first-degree murder conviction under K.S.A. 21-3401 and his capital murder conviction under K.S.A. 21-3439(a)(6) were improperly multiplicitous and his punishment for both crimes violated the Double Jeopardy Clause. Because Trotter was convicted of crimes defined by two separate statutes, he argued the strict-elements test applied and noted that *all* of the elements of premeditated first-degree murder had to be proven as *some* of the elements of capital murder under K.S.A. 21-3439(a)(6), which defines capital murder as the "intentional and premeditated killing of more than one person as a part of the same act or transaction or in two or more acts or transactions connected together or constituting parts of a common scheme or course of conduct." We agreed with the defendant's argument and concluded the premeditated first-degree murder conviction was a

lesser included offense of the capital murder count and must be reversed under K.S.A. 21-3107(2). *Trotter*, 288 Kan. at 120-24.

In reaching this holding in *Trotter*, we relied on earlier decisions in which we had held that K.S.A. 21-3439(a)(6) created a unit of prosecution that is comprised of the premeditated first-degree murder of one victim and the commission of an additional, aggravating premeditated first-degree murder as part of the same transaction or common scheme. The combination of the two murders elevated the crime to a capital offense, and the two first-degree murders were recognized as lesser included offenses of the capital murder. See *State v. Scott*, 286 Kan. 54, 65-66, 183 P.3d 801 (2008); *State v. Martis*, 277 Kan. 267, Syl. ¶ 1, 83 P.3d 1216 (2004).

Further, the *Trotter* court noted that the key inquiry in a double jeopardy analysis is to determine what measure of punishment the legislature intended. Consequently, the *Trotter* court considered whether there was a legislative intent to allow the multiple punishment and concluded the plain language of K.S.A. 21-3439 did not express a legislative intent to override K.S.A. 21-3107(2), which clearly states that a defendant cannot be convicted of both a primary and lesser included offense. See *Trotter*, 288 Kan. at 122-23 (citing *Scott*, 286 Kan. at 65-66, 68).

The *Trotter* analysis guides our consideration of Appleby's claim of statutory multiplicity. Although Trotter's capital murder conviction was based on K.S.A. 21-3439(a)(6) and Appleby's conviction is based on K.S.A. 21-3439(a)(4), we find no basis to reach a different conclusion simply because the aggravating felony is attempted rape rather than a premeditated first-degree murder. In the same manner that the State must prove the elements of the lesser offense of premeditated first-degree murder when the charge arises under K.S.A. 21-3439(a)(6), the State must prove the lesser offense of a sex crime—in this case, attempted rape—when the capital murder charge is brought under K.S.A. 21-3439(a)(4). To prove the elements of capital murder, the State had to prove beyond a reasonable doubt that Appleby intentionally, and with premeditation, killed A.K. in the commission of, or subsequent to, the crime of attempted rape. Hence, *all* of the elements of attempted rape were identical to *some* of the elements of the capital

murder, meaning the attempted rape was a lesser included offense. Under K.S.A. 21-3107(2), Appleby could not be convicted of both, and imposing sentences for both convictions violated Appleby's rights to be free from double jeopardy as guaranteed by the Fifth Amendment to the United States Constitution and § 10 of the Kansas Constitution Bill of Rights.

Recognizing this potential extension of our holding in *Trotter*, the State urges our reconsideration of that decision, arguing the decision is contrary to the holding in *Harris*, 284 Kan. 560, and the felony-murder rule, as applied through the inherently dangerous felony statute. We reject both arguments.

Regarding the first argument, the holding in *Harris* does not apply to the issue in this case. The specific issue raised in *Harris* was whether there was a double jeopardy violation because two of the defendant's three convictions of capital murder were based on the same group of related murders. The issue arose from Harris' multiple convictions under a single statute—K.S.A. 21-3439(a)(6), the multiple-murder subparagraph of the capital murder statute. This contrasts with Trotter's convictions which arose under two statutes—K.S.A. 21-3439(a)(6), the multiple-murder subparagraph of the capital murder statute, and K.S.A. 21-3401, the first-degree murder statute.

Because Harris' convictions arose from a single statute, the "unit of prosecution" test was applied to determine if there had been a double jeopardy violation. Under that test, the question is: What did the legislature intend as the unit of prosecution in a capital murder case? See *Schoonover*, 281 Kan. at 497-98. In *Harris*, we answered this question by determining that the legislature has proscribed the unit of prosecution as the murder of more than one person in one act or transaction or in related acts or transactions joined by a common scheme. *Harris*, 284 Kan. 560, Syl. ¶ 6. This meant that two of Harris' capital murder convictions had to be reversed because the State charged the murders as part of one scheme. *Harris*, 284 Kan. at 577-78.

In reaching that holding, we recognized that "under other circumstances, a defendant may be convicted and punished appropriately and constitutionally on multiple counts of capital murder,

as that offense is defined in K.S.A. 21-3439(a)(1) through (7)." *Harris*, 284 Kan. at 578. In this case, the State suggests that this statement in *Harris* supports cumulative punishment under the facts in *Trotter* and, by extension, in this case. The State's argument fails, however, because it does not recognize that the comment in *Harris* was intended to recognize the possibility of charges being brought under different subparagraphs of the capital murder statute—*i.e.*, two different theories—resulting in multiple counts. Further, the State confuses the unit of prosecution test applied in *Harris* with the multiple-description, *i.e.*, the strict-elements, test applied in *Trotter*.

The distinction is clarified when the sentence from *Harris* is read in context; doing so explains the court was referring to a potential issue not reached in *Harris* and not at issue in this case. Specifically, after the sentence relied on by the State, the court cited *Brooks v. State*, 973 So. 2d 380 (Ala. Crim. App. 2007), in which the defendant had been convicted of four counts of capital murder in connection with the murder of a 12-year-old boy. The offense satisfied four definitions of capital murder contained in Ala. Code § 13A-5-40(a) (2006). That potential situation and the situation actually at issue in *Harris* raised unit of prosecution questions, not strict-elements issues. Our holding in *Trotter* is consistent with the unit of prosecution analysis in *Harris* because, in both cases, we considered multiple murders to be one unit of prosecution.

Nevertheless, such a conclusion did not resolve the issue in *Trotter* because Trotter was not convicted of multiple counts arising from the same statute and, therefore, the unit of prosecution test was not the controlling test. Rather, Trotter's convictions arose from multiple statutes; specifically, the issue presented in *Trotter* was whether the defendant could be convicted of one count under K.S.A. 21-3439(a)(6)—capital murder—and of another count under K.S.A. 21-3401—premeditated first-degree murder. Under those circumstances—*i.e.*, when punishment is imposed for violations of two different statutes—the multiple-description, otherwise known as the strict-elements, test under K.S.A. 21-3107 applies. See *Schoonover*, 281 Kan. at 497-98.

This case, like *Trotter*, presents a multiple-description issue: Can Appleby be convicted of both capital murder under K.S.A. 21-3439(a)(4) and attempted rape under K.S.A. 21-3301 (attempt) and K.S.A. 21-3502 (rape)? The multiple-description, strict-elements test applies to the determination of this issue and *Harris'* unit of prosecution analysis has no application.

The second argument raised by the State is that the felony-murder rule, as applied through the inherently dangerous felony statute, specifically allows multiple convictions for both the homicide and an underlying felony. The State cites to *State v. Holt*, 260 Kan. 33, 917 P.2d 1332 (1996), for its holding that convictions for a felony murder and the underlying felony did not violate double jeopardy. The State relies on the *Holt* court's statements that there is a " 'distinction between the "lesser included offense" doctrine and the "felony murder" doctrine. Each is a separate theory of law. Each exists in a distinct legal pigeonhole.' " *Holt*, 260 Kan. at 45; see also *Schoonover*, 281 Kan. at 489-92 (discussing felony-murder doctrine and double jeopardy).

The most obvious problem with the State's argument is that the inherently dangerous felony statute, K.S.A. 21-3436, does not apply to the capital murder statute. Rather, the inherently dangerous felony statute defines the homicides to which it applies by stating:

"(a) Any of the following felonies shall be deemed an inherently dangerous felony whether or not such felony is so distinct from the homicide alleged to be a violation of subsection (b) of K.S.A. 21-3401, and amendments thereto, as not to be an ingredient of the homicide alleged to be a violation of subsection (b) of K.S.A. 21-3401, and amendments thereto." K.S.A. 21-3436.

The referenced homicide statute—the *only* referenced homicide statute—is K.S.A. 21-3401(b), the felony-murder statute, which applies "to the killing of a human being . . . in the commission of, attempt to commit, or flight from an inherently dangerous felony as defined in K.S.A. 21-3436." K.S.A. 21-3439—the capital murder statute—is neither referenced nor incorporated into the inherently dangerous felony statute—K.S.A. 21-3436.

In addition, as we noted in *Trotter*, the capital murder statute does not contain language similar to that found in the inherently dangerous felony statute, which provides that the homicide and

the inherently dangerous felony are distinct and do not merge. *Trotter*, 288 Kan. at 122-23 (citing *Scott*, 286 Kan. at 68); compare K.S.A. 21-3107 with K.S.A. 21-3439. As we have frequently recognized, this language in the inherently dangerous felony statute reflects that the legislature understands the need to express an intent to allow convictions under two statutes for the same conduct and knows how to do so. See *Schoonover*, 281 Kan. at 490-91; see also *State v. Farmer*, 285 Kan. 541, Syl. ¶ 4, 175 P.3d 221 (2008); *State v. Conway*, 284 Kan. 37, 57, 159 P.3d 917 (2007); *State v. Walker*, 283 Kan. 587, 611, 153 P.3d 1257 (2007).

Because the legislature did not include similar language in the capital murder statute, our analysis is governed by the expression of legislative intent stated in K.S.A. 21-3107(2)(b). Applying the strict-elements test under that provision, Appleby's two convictions—one for capital murder based upon the intentional and premeditated killing of A.K. in the commission of, or subsequent to, the attempted rape of A.K. under K.S.A. 21-3439(a)(4) and the other for the attempted rape of A.K. under K.S.A. 21-3301 and K.S.A. 21-3502—are improperly multiplicitous and violate Appleby's right to be free from double jeopardy. Appleby's sentence for the attempted rape conviction must be vacated.

## Issue 2. Suppression of Confession

Next, Appleby contends the trial court erred by admitting into evidence the incriminating statements he made to Kansas detectives. Appleby argues the statements must be suppressed because he asked about an attorney while he was being booked on the Connecticut arrest warrant.

### A. Attorney Requests

This argument differs from the typical issue arising from the application of *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, *reh. denied* 385 U.S. 890 (1966), in that Appleby was arrested in another state on unrelated charges, and the arresting officer, Detective Jewiss, had no intention of interrogating Appleby; typically a *Miranda* issue arises when there is custodial interrogation related to the crime on which the arrest was based.

Under the circumstances of this case, the State argues Appleby's questions about whether he would be allowed to talk to an attorney were, at most, an invocation of Sixth Amendment rights related to the Connecticut charges. Appleby argues that he was asserting his Fifth Amendment rights and the assertion applied to both cases. To understand these arguments, a more detailed discussion of the interaction is necessary.

When Appleby was arrested in Connecticut, he was arrested on the Connecticut charges only, even though the arrest was timed to occur when Kansas detectives were in Connecticut and the arrest may not have occurred if Kansas law enforcement had not contacted the Connecticut State Police Department to request assistance in investigating Appleby. But this involvement was behind the scene; the Kansas detectives did not directly participate when Detective Jewiss took Appleby into custody at his home, and Appleby was not aware of their presence until after he had asked the Connecticut detectives the four questions about whether he could talk to an attorney. Appleby did ask Detective Jewiss why there were so many officers at his house, and the detective explained a search warrant was being executed and the officers were going to search the home. Appleby questioned what the search was about, and Jewiss replied that he "wasn't going to talk to him any further about the case; that somebody else would talk to him."

During the approximately 3-mile drive to the police station, Detective Jewiss did not ask Appleby any questions, but Appleby volunteered information about his use of the alias of Teddy Hoover.

When Detective Jewiss and Appleby arrived at the station, Detective Jewiss began the routine book-in process on the Connecticut arrest warrant. At this point, before Appleby had been *Mirandized*, Appleby asked "if he was going to have the opportunity to talk to an attorney." Detective Jewiss replied "absolutely." Detective Jewiss testified he understood this to be a question regarding procedure, not an invocation of the right. While testifying at the suppression hearing, Detective Jewiss was asked if he was questioning Appleby at this point in time. He answered, "Not at all. I even informed him that I wouldn't be questioning him, and that I wouldn't talk to him about either of these cases."

After Appleby asked about an attorney, he was read a notice of rights form that listed the three Connecticut charges—risk of injury to a minor, disorderly conduct, and public indecency. The form also advised of *Miranda* rights and stated in part: "You may consult with an attorney before being questioned; you may have an attorney present during questioning, and you cannot be questioned without your consent." Appleby signed the notice of rights form, which was an acknowledgment, not a waiver of rights.

Soon after that exchange, another Connecticut detective advised Appleby of the search warrant that authorized the officer to swab the inside of Appleby's mouth in order to obtain a DNA sample. Detective Jewiss testified that Appleby asked if he had the right to say "no" and then asked if he could speak to an attorney about his right to refuse the testing. According to Detective Jewiss, the detectives advised Appleby he could not talk to an attorney at that point regarding a search that had been authorized by a judge.

Following the DNA swabbing, Detective Jewiss continued with the book-in process on the Connecticut charges. Appleby was fingerprinted and photographed, the property on his person was inventoried, and a personal information data sheet was completed. During that process, Appleby asked two more times whether he would have an opportunity to talk to an attorney.

At the suppression hearing, Detective Jewiss repeatedly testified that he understood Appleby to be "asking about our procedure as in . . . will he have the opportunity to talk to an attorney." According to Detective Jewiss, the question was never in the context of "I don't want to talk to you" or "I don't want to talk to anybody without an attorney here."

Detective Jewiss testified that during the book-in process he asked Appleby his name, date and place of birth, residence, and similar book-in questions. The only other question he asked came about 30 minutes after they arrived at the police station when Detective Jewiss asked Appleby if he wanted to talk to some people about an unrelated matter. Appleby said he would. Detective Jewiss was asked if Appleby brought up the word "attorney" at that time, and he replied, "No, he didn't."

Detective Jewiss was also asked why he did not give Appleby the opportunity to speak to an attorney before sending him upstairs to be interrogated by the Kansas detectives. Detective Jewiss, who had repeatedly stated that he had understood Appleby to be asking about procedure and had explained that a defendant would typically be allowed to contact an attorney only after the book-in process was complete, testified that "[t]here was still some processing that I had to continue with."

When Detective Jewiss transferred Appleby to the Kansas detectives, he reported that Appleby had not invoked his right to counsel, "but he has asked something about an attorney when the [DNA] search warrant was being conducted." Detective Jewiss did not tell the Kansas detectives about the other instances when Appleby asked whether he would be able to talk to an attorney.

After Detective Jewiss left, the two Kansas detectives asked Appleby if he wanted to answer some questions about the murder of A.K. He said he wanted to talk to them, and the detectives then told him he would be read his *Miranda* rights again since he was being interviewed "on a different charge from what he was arrested." After being read his rights, Appleby said he understood them and was willing to answer some questions. He was questioned for approximately 2 and ½ hours, the final 20 minutes on videotape. At no point during the questioning by the Kansas detectives did Appleby indicate he wished to speak to or have the assistance of an attorney.

## B. Trial Court's Findings

Appleby filed three pretrial motions to suppress the statements he made to the Kansas detectives. After hearing the testimony we have described above, the trial court denied Appleby's motions in a memorandum decision. The trial court explained that although Appleby's initial motion to suppress cited to the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and to three provisions of the Kansas Constitution Bill of Rights, he later limited his claim to "the admissibility [of the statements] under the Fifth and Fourteenth Amendments." Therefore, the trial court limited its scope of analysis.

The trial court recognized there are two questions to ask in the determination of whether a suspect has invoked his or her Fifth Amendment right to counsel: (1) whether the suspect articulated a desire to have an attorney present sufficiently clearly that a reasonable officer in the circumstances would understand the statement to be a request for an attorney and (2) whether an attorney is being requested for purposes of interrogation rather than in regard to later hearings or proceedings. See *State v. Walker*, 276 Kan. 939, 945, 80 P.3d 1132 (2003). The trial court concluded Appleby clearly requested an attorney, but he did not make it clear he wanted the attorney to assist with questioning rather than to have assistance with his case.

Regarding the clear indication that Appleby wanted the assistance of counsel, the trial court noted Appleby had asked four times about contacting an attorney in a period of approximately 30 minutes. The trial court found that, although Appleby's requests were never phrased as a demand, "they clearly communicated a desire to call his attorney without substantial further delay."

Yet, in concluding the purpose of Appleby's request was not clear, the trial court stated:

"There are many purposes Appleby could have sought to accomplish by contacting his lawyer. At the time he made those requests, no one had indicated to him that his arrest was connected in any way to the [A.K.] murder investigation. He may have wanted his attorney to try to determine whether that was the real reason multiple officers had shown up to search his residence. Or Appleby may simply have wanted to learn the procedural steps that might take place following his arrest. Or he may have wanted his attorney to take steps to secure his release on bond. Other purposes could have been present as well, including the desire to obtain the assistance of counsel in dealing with any questioning that might ensue after 'processing' was completed."

In addition, the trial court found:

"Appleby's lack of intent to obtain a lawyer to assist with any pending custodial interrogation is an inference supported by his later (a) saying affirmatively that he wanted to speak to the [Kansas] detectives, (b) making an explicit *Miranda* waiver for them, (c) speaking with them for two and a half hours, and (d) never mentioning a lawyer during that interview."

Consequently, the trial court denied Appleby's motion to suppress, finding that based upon Appleby's statements and the con-

text in which they were made, "he did not ask for counsel for the purpose of assisting him with an imminent custodial interrogation."

## C. Standard of Review

In reviewing the trial court's decision regarding suppression, this court reviews the factual underpinnings of the decision by a substantial competent evidence standard and the ultimate legal conclusion by a de novo standard. We do not reweigh evidence or assess the credibility of witnesses but will give deference to the trial court's findings of fact. *State v. Warledo*, 286 Kan. 927, 934-35, 190 P.3d 937 (2008); *State v. Ackward*, 281 Kan. 2, 8, 128 P.3d 382 (2006).

## D. Defendant's Arguments

Appleby argues his requests for an attorney were clear and sufficient to require the Kansas detectives to refrain from questioning him until his requests were honored or until he had initiated contact with them. Appleby contends that his statements to the Kansas detectives, therefore, should have been suppressed. To support his argument, he (1) cites a Montana case holding that law enforcement officers and, in turn, courts must broadly interpret any reference to an attorney by a suspect; (2) cites an Oregon decision to suppress a suspect's statements under circumstances Appleby argues are factually similar to this case; and (3) argues the trial court's reasoning imposes too exacting a standard, essentially requiring the suspect to use the specific words of "I want an attorney to assist me with your purposed custodial interrogation," and that his statements to Detective Jewiss were sufficiently clear to invoke his Fifth Amendment right to counsel.

In making these arguments, Appleby groups together all of the instances where he referred to an attorney during the book-in process. Nevertheless, as we analyze his arguments, we recognize that one of the instances was of a different character than the others; that was the one made in response to the execution of the search warrant for purposes of obtaining DNA swabs. In that instance, Appleby clearly asked if he could talk to his attorney about whether he could refuse to allow the swabbing. In the three other instances, his questions were more general, as he asked whether he would

have the opportunity to talk to an attorney. The differing nature of these questions is important as we consider the cases cited by Appleby.

### 1. Broad Interpretation

In arguing that any mention of an attorney must be broadly interpreted, Appleby cites *State v. Buck*, 331 Mont. 517, 134 P.3d 53 (2006), in which the request made for an attorney was similar to Appleby's question about whether he could talk to an attorney about the DNA search warrant. However, *Buck* is not cited by Appleby because of its factual similarity but because of the court's recognition that law enforcement officers and courts should give broad effect to any mention of an attorney by a suspect.

In *Buck*, when served with a search warrant allowing officers to obtain fingernail scrapings, the suspect said, " 'I'll just wait and talk to a lawyer.' " *Buck*, 331 Mont. at 521. Yet, when given the opportunity to call a lawyer, the suspect refused to do so. Several days later, the suspect—who had remained in custody—was again taken to the police station, *Mirandized*, and asked if he would answer questions. He agreed and confessed. The suspect later sought suppression of his confession, arguing his statement that he wanted to talk to an attorney before submitting to the fingernail scraping was an unambiguous invocation of his *Miranda* rights.

In considering this argument, the Montana court noted that in *Connecticut v. Barrett*, 479 U.S. 523, 529-30, 93 L. Ed. 2d 920, 107 S. Ct. 828 (1987), the United States Supreme Court observed its past decisions had "given broad effect to requests for counsel" and that Montana had a long-standing rule of liberally construing any mention of an attorney by a suspect. *Buck*, 331 Mont. at 536-37. The Montana court stated:

"[N]o suspect has an affirmative obligation to explain precisely why he or she wants legal assistance. . . . [I]f there is any reasonable doubt as to whether a suspect's request for counsel is limited to only certain aspects of his or her interaction with investigating officers, the request must be construed as an invocation of the right to counsel in custodial interrogation." *Buck*, 331 Mont. at 537.

Appleby urges our adoption of the same viewpoint. We reject that invitation for several reasons. First, the Montana court's state-

ment cannot be isolated from the holding in the case, which followed *Barrett*. In *Barrett*, the United States Supreme Court refused to suppress a verbal statement made after a suspect told law enforcement officers he would talk to them, but he would not give a written statement before talking to his attorney. *Barrett*, 479 U.S. at 529-30. Considering *Barrett* and factually similar cases from other states, the Montana court concluded that Buck had not invoked his right to the assistance of counsel for the purpose of assisting with interrogation when he refused to submit to fingernail scraping until he had talked to an attorney. The Montana court stated:

"[A] suspect may seek legal assistance for only limited purposes in his or her dealings with law enforcement. Based upon this recognition, and pursuant to *Barrett*, we hold that a suspect's request for counsel which is unambiguously limited to a police procedure that does not involve verbal inquiry, does not constitute an invocation of the right to counsel in custodial interrogation. Rather, a clearly limited request is properly construed according to its plain meaning, assuming that the suspect fully understands his or her right to counsel." *Buck*, 331 Mont. at 536-37.

The same conclusion applies in this case to the one comment made by Appleby in the context of the DNA search warrant. Detective Jewiss testified that after being presented with the warrant, "Mr. Appleby then asks if he has the right to say no. He also asks if—at that point if he can talk to his attorney about his right to say no for that." This statement was unambiguous and was a request for limited assistance. Clearly, it was not a request for the assistance of an attorney for the purpose of assisting with the custodial interrogation. Undoubtedly, it is because of the precedent of *Barrett* that Appleby does not isolate the DNA search-warrant comment as a clear invocation of his Fifth Amendment right to counsel and relies on *Buck* only for its dicta about broadly construing a suspect's comments.

As to this latter point, we reject the Montana court's analysis because of decisions of the United States Supreme Court decided after *Barrett* that are not discussed in *Buck*. Significant to Appleby's argument is *Davis v. United States*, 512 U.S. 452, 129 L. Ed. 2d 362, 114 S. Ct. 2350 (1994). The *Davis* Court noted that

*Barrett,* 479 U.S. at 529-30, and *Smith v. Illinois,* 469 U.S. 91, 96 & n.3, 83 L. Ed. 2d 488, 105 S. Ct. 490 (1984), mentioned the issue of ambiguous and equivocal requests for counsel but had "not addressed the issue on the merits. We granted certiorari, [citation omitted], to do so." *Davis,* 512 U.S. at 456.

Faced squarely with the issue, the Court held that "the suspect must unambiguously request counsel." *Davis,* 512 U.S. at 459. Stating the holding in another way, the Court said: "We decline petitioner's invitation to extend *Edwards* and require law enforcement officers to cease questioning immediately upon the making of an ambiguous or equivocal reference to an attorney. [Citation omitted.]" *Davis,* 512 U.S. at 459. Further, the Court declined to adopt a rule requiring officers to ask clarifying questions. *Davis,* 512 U.S. at 461. The Court reasoned:

"We recognize that requiring a clear assertion of the right to counsel might disadvantage some suspects who—because of fear, intimidation, lack of linguistic skills, or a variety of other reasons—will not clearly articulate their right to counsel although they actually want to have a lawyer present. But the primary protection afforded suspects subject to custodial interrogation is the *Miranda* warnings themselves. '[F]ull comprehension of the rights to remain silent and request an attorney [is] sufficient to dispel whatever coercion is inherent in the interrogation process.' [Citation omitted.] A suspect who knowingly and voluntarily waives his right to counsel after having that right explained to him has indicated his willingness to deal with the police unassisted." *Davis,* 512 U.S. at 460-61.

Applying this authority, we reject Appleby's argument that any mention of counsel must be construed broadly. Rather, the trial court was correct in examining whether Appleby's questions were unambiguous requests for the assistance of counsel for the purpose of the interrogation.

### 2. *Oregon Case Law*

Alternatively, Appleby argues his assertion of Fifth Amendment rights was not ambiguous or equivocal. To support this argument, he cites *State v. Dahlen,* 209 Or. App. 110, 146 P.3d 359, *modified* 210 Or. App. 362, 149 P.3d 1234 (2006) (remanded for further proceedings, not new trial).

In *Dahlen,* the defendant was placed in a holding cell after his arrest. Approximately 8 hours later, the suspect knocked on his cell

door to get the attention of jailers and asked, " 'When can I call my attorney?' " 209 Or. App. at 115. Less than an hour later, the suspect asked the same question. Then, 11 hours after his arrest, officers *Mirandized* the suspect, the suspect waived his rights, the officers asked questions, and the suspect confessed.

The Oregon Court of Appeals suppressed the confession after concluding the suspect's question of when he could call his attorney was unequivocal and objectively would be understood to mean that the suspect wanted to call his attorney as soon as possible. *Dahlen*, 209 Or. App. at 117-19. In reaching this conclusion, the court distinguished a decision of the Oregon Supreme Court, *State v. Charboneau*, 323 Or. 38, 54, 913 P.2d 308 (1996). In *Charboneau*, the suspect asked, " 'Will I have an opportunity to call an attorney tonight?' "; the Oregon Supreme Court held this request was equivocal and ambiguous and did not require the suppression of the suspect's confession. *Charboneau*, 323 Or. at 52, 55-56.

As we compare the questions asked by the suspects in *Dahlen* and *Charboneau* with Appleby's repeated questions of whether he would be able to talk to an attorney, the *Charboneau* question— "Will I have an opportunity to call an attorney tonight?"—is more similar. The discussion in *Dahlen* cites dictionary definitions and other sources to substantiate the view that asking "when" is a more definite statement than asking "will." *Dahlen*, 209 Or. App. at 118. As we apply that discussion to this case, we note that asking "will" is essentially the same as asking "whether." Hence, we find the Oregon Supreme Court's analysis of the defendant's question in *Charboneau* to be more applicable and the analysis of the question in *Dahlen* to be inapposite.

Interestingly, the contrast between the two statements and the discussion in *Dahlen* actually raises questions about the trial court's conclusion that Appleby asserted a right to counsel even for Sixth Amendment purposes. We need not parse that question any further, however, because we agree with the trial court's conclusion that Appleby's statements were ambiguous and not a clear invocation of Fifth Amendment rights. As noted earlier, because of the interplay of two investigations the potential for this type of ambiguity is greater in this case than the typical scenario and, on this

basis, *Dahlen* is distinguishable. The potential for this ambiguity did not arise under the facts of *Dahlen* and, consequently, did not need to be addressed.

Consequently, Appleby's reliance on *Dahlen* is misplaced.

### 3. *Fifth and Sixth Amendment Rights*

Finally, disagreeing with the trial court's conclusion that the circumstances created ambiguity, Appleby asserts that the potential interplay between Fifth and Sixth Amendment rights did not need to be considered in this case. He argues that the trial court improperly created two tests that place too exacting a standard on a suspect's attempts to request the assistance of counsel. Further, he argues a reasonable law enforcement officer would have understood he was asserting his Fifth Amendment rights.

In response, the State contends that Appleby's requests for an attorney are more akin to a Sixth Amendment invocation of the right to counsel than a Fifth Amendment invocation of the right to counsel. It argues Appleby's requests could not reasonably be construed to be requests for assistance with custodial interrogation because he was not being interrogated at the time he made those requests. In addition, the State asserts that the *Miranda* right to counsel may not be anticipatorily invoked.

The State's arguments bring into issue the interrelationship of Fifth and Sixth Amendment rights, which was discussed by the United States Supreme Court in *McNeil v. Wisconsin*, 501 U.S. 171, 115 L. Ed. 2d 158, 111 S. Ct. 2204 (1991), under circumstances similar to those in this case—*i.e.*, where an arrest is made in one case and an interrogation relates to another. In *McNeil*, the defendant was arrested in Omaha, Nebraska, pursuant to a Wisconsin warrant based on charges of an armed robbery outside Milwaukee. Milwaukee detectives went to Omaha to retrieve McNeil. The detectives advised McNeil of his *Miranda* rights and began to ask questions. McNeil refused to answer any questions, the interview ended, and he was taken to Wisconsin where an attorney was appointed to represent him.

Later that day, McNeil was visited by officers from a different Wisconsin county. The county detectives advised McNeil of his

*Miranda* rights, and McNeil signed a form waiving those rights. The county detectives then asked McNeil about charges of murder, attempted murder, and armed robbery. McNeil denied any involvement in the crimes. Two days later the county detectives returned and again advised McNeil of his *Miranda* rights. McNeil again waived his rights and this time confessed.

McNeil sought suppression of his statement to the county detectives asserting a Sixth Amendment right to counsel, but the Supreme Court determined his confession was admissible. *McNeil*, 501 U.S. at 175-76, 181-82. The ruling was based on the distinction between McNeil's Fifth and Sixth Amendment rights. The Supreme Court explained that the Sixth Amendment right to counsel had attached in the Milwaukee case. *McNeil*, 501 U.S. at 175; see *Brewer v. Williams*, 430 U.S. 387, 398, 51 L. Ed. 2d 424, 97 S. Ct. 1232, *reh. denied* 431 U.S. 925 (1977) (Sixth Amendment right to counsel attaches on filing of formal charges, indictment, or information; on arraignment; or on arrest on warrant and arraignment thereon). But that right, the Court explained, is offense specific and cannot be invoked once for all future prosecutions. *McNeil*, 501 U.S. at 175. As a result, " '[i]ncriminating statements pertaining to other crimes, as to which the Sixth Amendment right has not yet attached, are, of course, admissible at the trial of those offenses.' [Citation omitted.]" *McNeil*, 501 U.S. at 176.

A similar dividing line is not drawn, however, when the Fifth Amendment right to counsel—which is protected by *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, *reh. denied* 385 U.S. 890 (1966)—is invoked (which McNeil did not do in arguing his appeal). In other words, Fifth Amendment rights are not offense specific. See *Arizona v. Roberson*, 486 U.S. 675, 100 L. Ed. 2d 704, 108 S. Ct. 2093 (1988). Thus, the *McNeil* Court noted that "[o]nce a suspect invokes the *Miranda* right to counsel for interrogation regarding one offense, he may not be reapproached regarding *any* offense unless counsel is present. [Citation omitted.]" (Emphasis added.) *McNeil*, 501 U.S. at 177. Further, *Edwards v. Arizona*, 451 U.S. 477, 484-85, 68 L. Ed. 2d 378, 101 S. Ct. 1880, *reh. denied* 452 U.S. 973 (1981),

"established a second layer of prophylaxis for the *Miranda* right to counsel: Once a suspect asserts the right, not only must the current interrogation cease, but he may not be approached for further interrogation 'until counsel has been made available to him,' [*Edwards*], 451 U.S. at 484-485,—which means, we have most recently held, that counsel must be present, *Minnick v. Mississippi*, 498 U.S. 146[, 112 L. Ed. 2d 489, 111 S. Ct. 486] (1990). If the police do subsequently initiate an encounter in the absence of counsel (assuming there has been no break in custody), the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at trial, even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards. This is 'designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights,' *Michigan v. Harvey*, 494 U.S. 344, 350[,108 L. Ed. 2d 293, 110 S. Ct. 1176] (1990)." *McNeil*, 501 U.S. at 176-77.

See also *State v. Morris*, 255 Kan. 964, 976-79, 880 P.2d 1244 (1994) (discussing *McNeil*).

Recently, in *Montejo v. Louisiana*, 556 U.S. 778, 173 L. Ed. 2d 955, 129 S. Ct. 2079 (2009), the Supreme Court reaffirmed this Fifth Amendment jurisprudence, concluding the three layers of protection—*Miranda*, *Edwards*, and *Minnick*—are sufficient. *Montejo*, 173 L. Ed. 2d at 968. However, the *Montejo* Court modified some aspects of its Sixth Amendment jurisprudence. Specifically, it overruled *Michigan v. Jackson*, 475 U.S. 625, 89 L. Ed. 2d 631, 106 S. Ct. 1404 (1986), because of that decision's " 'wholesale importation of the *Edwards* rule into the Sixth Amendment.' " *Montejo*, 173 L. Ed. 2d at 964, 970 (overruling *Jackson*).

However, except to separate the exclusionary rule that would apply under the Sixth Amendment from that which applies when Fifth Amendment rights are violated, the *Montejo* Court did not modify *McNeil*'s dividing lines between Fifth and Sixth Amendment analysis, even though much of that analysis was based on *Jackson*, which the *Montejo* Court overruled. In particular, the *Montejo* Court did not alter the *McNeil* requirement that, even if Sixth Amendment rights have been invoked, a defendant must affirmatively assert Fifth Amendment rights if subjected to a custodial interrogation in another case. See *Montejo*, 173 L. Ed. 2d at 968-70. As a result, if Appleby asserted Sixth Amendment rights,

as the State suggests, the assertion was effective only in the Connecticut case.

Moreover, a Sixth Amendment assertion is not an assertion of the right to counsel during an interrogation—the right protected by the Fifth Amendment. The *McNeil* Court explained: "To invoke the Sixth Amendment interest is, as a matter of *fact, not* to invoke the *Miranda-Edwards* interest. One might be quite willing to speak to the police without counsel present concerning many matters, but not the matter under prosecution." *McNeil*, 501 U.S. at 178; see *Rhode Island v. Innis*, 446 U.S. 291, 300, 64 L. Ed. 2d 297, 100 S. Ct. 1682 (1980) (*Miranda*'s safeguards and procedural protection of Fifth Amendment rights "are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation.").

Because the accused's purpose in requesting an attorney must be determined in order to sort the interplay of these rights, the *McNeil* Court concluded that an effective invocation of the Fifth Amendment right to counsel

"applies only when the suspect 'ha[s] expressed' his wish for the particular sort of lawyerly assistance that is the subject of *Miranda*. [Citation omitted.] It requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney *in dealing with custodial interrogation by the police*." *McNeil*, 501 U.S. at 178.

See *State v. Walker*, 276 Kan. 939, 945, 80 P.3d 1132 (2003) (recognizing two aspects to assertion of Fifth Amendment rights: [1] a reasonable police officer in the circumstances would understand request was made for an attorney and [2] the request was for assistance with a custodial interrogation, not for subsequent hearings or proceedings).

The *Montejo* Court reiterated this analysis and provided some guidance in making the determination of whether a request is for an attorney's assistance with a custodial interrogation. It stated:

" 'We have in fact never held that a person can invoke his *Miranda* rights anticipatorily, in a context other than "custodial interrogation" . . . .' *McNeil, supra* [501 U.S.] at 182, n.3[, 111 S. Ct. 2204, 115 L. Ed. 2d 158]. What matters for *Miranda* and *Edwards* is *what happens when the defendant is approached for interrogation,*

and (if he consents) what happens during the interrogation . . . ." (Emphasis added.) *Montejo*, 556 U.S. at 797.

Even before the *Montejo* decision, the State in its brief in this case focused on *McNeil*'s statement and argued that Appleby could not anticipatorily assert his Fifth Amendment right. This view is supported by a majority of federal and state courts that have relied on the language in *McNeil* to hold that one cannot anticipatorily invoke the right to counsel prior to any custodial interrogation. See, *e.g.*, *United States v. Grimes*, 142 F.3d 1342, 1347-48 (11th Cir. 1998), *cert. denied* 525 U.S. 1088 (1999); *United States v. LaGrone*, 43 F.3d 332, 337-38 (7th Cir. 1994); *United States v. Thompson*, 35 F.3d 100, 103-04 (2d Cir. 1994); *Alston v. Redman*, 34 F.3d 1237, 1246 (3d Cir. 1994), *cert. denied* 513 U.S. 1160 (1995); *United States v. Wright*, 962 F.2d 953, 955 (9th Cir. 1992); *United States v. Kelsey*, 951 F.2d 1196, 1198-99 (10th Cir. 1991); *People v. Nguyen*, 132 Cal. App. 4th 350, 357, 33 Cal. Rptr. 3d 390 (2005); *Pardon v. State*, 930 So. 2d 700, 703-04 (Fla. Dist. App.), *rev. denied* 944 So. 2d 346 (Fla. 2006); *People v. Villalobos*, 193 Ill. 2d 229, 240-42, 737 N.E.2d 639 (2000); *Sauerheber v. State*, 698 N.E.2d 796, 802 (Ind. 1998); *Costley v. State*, 175 Md. App. 90, 110-12, 926 A.2d 769 (2007); *State v. Aubuchont*, 147 N.H. 142, 149-50, 784 A.2d 1170 (2001); *State v. Warness*, 77 Wash. App. 636, 640-41, 893 P.2d 665 (1995).

Some courts have been liberal in determining the temporal range in which interrogation could be considered "imminent." *E.g.*, *Kelsey*, 951 F.2d at 1198-99 (defendant, who asked three or four times to see his lawyer while in custody during search of home, had reasonable belief that interrogation was imminent or impending, making request for counsel effective invocation of Fifth Amendment *Miranda* right to counsel).

Other courts have been very restrictive in defining "imminent," allowing no intervening activity between the invocation of the right and the planned initiation of questioning. *E.g.*, *Nguyen*, 132 Cal. App. 4th at 357 (suspect did not invoke *Miranda*'s protections by attempting to call attorney during arrest); *Pardon*, 930 So. 2d at 703-04 (interrogation of suspect was not imminent; he was merely

being booked into detention, albeit on same charge on which he was later questioned); *Sauerheber*, 698 N.E.2d at 802 (*McNeil* "strongly suggests that the rights under *Miranda* and *Edwards* do not extend to permit anticipatory requests for counsel to preclude waiver at the time interrogation begins"; assertion of right when not being questioned ineffective even if in custody); *Costley*, 175 Md. App. at 111 (*McNeil* "suggests that custody, absent interrogation, is insufficient.").

Similarly, in a case cited by the trial court—*Aubuchont*, 147 N.H. 142—the court refused to suppress a statement simply because a suspect, while being arrested, yelled at his wife to call an attorney. The New Hampshire Supreme Court noted: "[T]he timing of the defendant's request controls whether he invoked his *Miranda* rights. The purpose of the defendant's request was ambiguous, because he made his request before he was subject to interrogation or under the threat of imminent interrogation." *Aubuchont*, 147 N.H. at 149. As a result, the court concluded: "[I]t is unclear whether the defendant simply wished to seek advice from his attorney or whether he wished to obtain assistance of counsel for some future interrogation." *Aubuchont*, 147 N.H. at 149-50.

This restrictive view is supported by the statements in *Montejo* that the Court had " 'in fact never held that a person can invoke his *Miranda* rights anticipatorily, *in a context other than "custodial interrogation"* ' " and "[w]hat matters for *Miranda* and *Edwards* is what happens when the defendant is approached for interrogation." (Emphasis added.) *Montejo*, 173 L. Ed. 2d at 970.

Yet the Court did not clearly explain what was meant by the context of a custodial interrogation or a context other than a custodial interrogation, and the facts of *Montejo* are very different from those in this case and therefore do not help to explain the meaning as it would be applied in this case. As in *McNeil*, the focus in *Montejo* was whether there had been an assertion of Sixth Amendment rights that prevented further interrogation. In fact, upon his arrest, Montejo waived his *Miranda* rights and gave police various versions of events related to the crime. A few days later at a preliminary hearing, known in Louisiana as a "72-hour hearing,"

counsel was appointed for Montejo even though he had not re-quested the appointment and had stood mute when asked if he wanted the assistance of an attorney. Later that same day, police approached Montejo, *Mirandized* him again, and asked him to ac-company them to locate the murder weapon. During the drive, Montejo wrote an inculpatory letter of apology to the victim's widow. After the drive, Montejo met his attorney for the first time. At trial, he objected to the admission of the letter, basing his ob-jection on *Jackson,* 475 U.S. 625. The Supreme Court held that the letter need not be suppressed based on an objection under *Jackson,* which it overruled. The Court concluded Montejo had not asserted his Sixth Amendment right to counsel. Yet, the Court con-cluded the case should be remanded to allow Montejo to assert an objection under *Edwards,* 451 U.S. 477, in other words, a Fifth Amendment objection. In discussing the Fifth Amendment right, the Court stressed that the *Edwards* rule was meant to prevent police from badgering defendants into changing their minds about the right to counsel once they had invoked it. *Montejo,* 173 L. Ed. 2d at 959. The Court made no attempt to suggest how these various Fifth Amendment principles would apply to Montejo's circum-stances.

Here, Appleby does not assert that a Sixth Amendment right to counsel requires the suppression of his confession. Nor did the trial court suppress on that basis. The trial court merely pointed to the possibility of a Sixth Amendment assertion in another case—or perhaps even the Kansas case—as a circumstance that caused Appleby's assertion to be ambiguous. He relies on a Fifth Amend-ment right to counsel and suggests his questions during the book-in process asserted that right. This argument brings us to the State's position that the right was not effectively asserted because Appleby was not in the interrogation room.

Recently, in a pre-*Montejo* case, the Wisconsin Supreme Court examined what the Supreme Court might have meant by its state-ment in *McNeil* that Fifth Amendment rights could not be asserted in a "context other than 'custodial interrogation' . . . ." *McNeil,* 501 U.S. at 182 n.3 (*language quoted in Montejo,* 173 L. Ed. 2d at 970). In *State v. Hambly,* 307 Wis. 2d 98, 745 N.W.2d 48 (2008), the

Wisconsin court noted a tension between statements in various decisions of the United States Supreme Court. Specifically, the *Hambly* court attempted to reconcile the above-stated *McNeil* language with the *Miranda* Court's statement that "a pre-interrogation request for a lawyer . . . affirmatively secures [the] right to have one." *Miranda*, 384 U.S. at 470. In doing so, the Wisconsin court noted the *Miranda* Court did not specifically address what is meant by a "pre-interrogation request" for counsel during custody and did not address at what point prior to custodial interrogation a suspect may effectively invoke the Fifth Amendment *Miranda* right to counsel. Likewise, the *McNeil* Court did not address the question of whether the " 'context' " of a custodial interrogation could cover circumstances before an actual interrogation begins. *Hambly*, 307 Wis. 2d at 111.

In light of that tension, the *Hambly* court felt it important to also consider the *McNeil* Court's recognition that, under *Edwards*, an effective invocation of the Fifth Amendment *Miranda* right to counsel " 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police.' " *Hambly*, 307 Wis. 2d at 112 (quoting *McNeil*, 501 U.S. at 178). With this in mind, the *Hambly* court concluded the timing of the request for counsel may help determine whether the request is for the assistance of an attorney in dealing with a custodial interrogation by the police. *Hambly*, 307 Wis. 2d at 112. While the *Hambly* court rejected the notion that a request for counsel can never be effective if made prior to interrogation, it concluded that the United States Supreme Court's case law recognizes that a suspect in custody may request counsel and effectively invoke the "*Miranda* right to counsel when faced with 'impending interrogation' or when interrogation is 'imminent' and the request for counsel is for the assistance of counsel during interrogation." *Hambly*, 307 Wis. 2d at 114-15; see also 2 LaFave, Israel, King & Kerr, Criminal Procedure § 6.9(g), p. 869 n.200 (3d ed. 2007) (citing cases for proposition that *Miranda* right to counsel may be validly asserted only when authorities are conducting custodial interro-

gation or such interrogation is imminent and request for counsel is for assistance of counsel during interrogation).

### E. Imminent Questioning/Equivocal Assertion

This approach is similar to that followed by the trial court in this case and in past decisions of this court where the context of a statement regarding an attorney has been analyzed to view whether an objective law enforcement officer would understand there had been an invocation of Fifth Amendment rights. For example, in *State v. Gant*, 288 Kan. 76, 201 P.3d 673 (2009), when considering facts very similar to those in *Aubuchont*, 147 N.H. 142—the case cited by the trial court—this court recently held a defendant did not assert his Fifth Amendment rights when he yelled to his companions while being arrested that they should call a lawyer. Although we did not consider the question of whether interrogation must be imminent, we did conclude the factual context revealed the defendant was directing his comments toward his companions, not police, and was not clearly and unambiguously asserting his right to counsel. *Gant*, 288 Kan. at 81; see *Walker*, 276 Kan. at 945; *Morris*, 255 Kan. at 976-81.

Now, we explicitly recognize what was implicit in many of our prior decisions: The timing as well as the content and context of a reference to counsel may help determine whether there has been an unambiguous assertion of the right to have the assistance of an attorney in dealing with a custodial interrogation by law enforcement officers.

This is the approach adopted by the trial court. In reaching the conclusion that the context in this case created ambiguity, the trial court made several findings that are supported by substantial competent evidence. Specifically, the trial court found that Appleby was aware he was being arrested by Connecticut authorities and was being charged for crimes committed in Connecticut. Further, Appleby had not been subjected to interrogation at that point in time about anything, in either the Connecticut or the Kansas case, and no one had indicated to him that his arrest was in any way connected to the murder of A.K. See *Pennsylvania v. Muniz*, 496 U.S. 582, 601, 110 L. Ed. 2d 528, 110 S. Ct. 2638 (1990) (recog-

nizing " 'routine booking question' exception which exempts from *Miranda's* coverage questions to secure the ' "biographical data necessary to complete booking or pretrial services." ' " Moreover, Detective Jewiss had informed Appleby that he would not be questioning him and that someone else would be talking to him about "the case." At that point in time, Appleby only knew of the Connecticut case. Hence, when Appleby asked whether he would have a chance to talk to an attorney, he knew he was not going to be questioned by Detective Jewiss. At that point in time, interrogation was clearly not imminent or impending.

It was not until minutes before the custodial interrogation with the Kansas detectives that Appleby was asked by Detective Jewiss if he would talk to some people about an unrelated matter. The trial court concluded that at that time: "Appleby undoubtedly believed that matter to be the [A.K.] murder investigation." Yet Appleby agreed without hesitation to speak to the detectives. Then Appleby was given his *Miranda* rights, which he clearly waived. He never asked about an attorney again. Thus, when questioning was imminent—when Appleby was approached for interrogation—he clearly waived his right to counsel.

We agree with the conclusion reached by the trial court that Appleby's references to an attorney during the book-in process on the Connecticut charges did not constitute a clear and unambiguous assertion of his Fifth Amendment right as protected by *Miranda*. The trial court did not err in denying Appleby's motion to suppress his custodial statements made to the Kansas detectives.

### ISSUE 3. POPULATION STATISTICS RELATED TO DNA TESTING

Next, Appleby contends the trial court erred by admitting into evidence a computer-generated report regarding population statistics as they relate to DNA testing. Specifically, he argues his confrontation rights under the Sixth Amendment to the United States Constitution were violated as those rights were defined in *Crawford v. Washington*, 541 U.S. 36, 68, 158 L. Ed. 2d 177, 124 S. Ct. 1354 (2004).

The trial court admitted the testimony of Dana Soderholm, formerly a forensic scientist for the Johnson County Crime Labora-

tory—now with the Kansas Bureau of Investigation (KBI) Kansas City Regional Laboratory—who used the Polymerase Chain Reaction-Short Tandem Repeat (PCR-STR) DNA analysis to test various items containing mixtures of blood, and Lisa Dowler, a Kansas City Crime Laboratory forensic chemist, who ran DNA tests on A.K.'s sports bra. These experts were permitted to testify regarding the DNA statistical population data that was generated when they compared, via a computer software program, their tested DNA profiles with databases of DNA profiles. Dowler and the Kansas City laboratory where she is employed use a regional database. Soderholm and the Johnson County laboratory where she was employed use the Federal Bureau of Investigation's (FBI) national DNA database known as the Combined DNA Indexing System (CODIS); the Johnson County laboratory is certified by the FBI to use the database. As Soderholm explained, when a DNA profile from a crime matches the DNA profile from a suspect, a statistical analysis is performed to determine how rare or common that particular DNA profile is in the general population. Soderholm testified:

"There is a software called Pop-Stats that is given to the labs by the CODIS group, and that is the information that we use. It is software that is already built in, and you do not get into the frequencies. You don't change any of that. You type in your alleles and the information is then calculated within the computer, and then you print it out.

. . . .

". . . The normal procedure is if you have an inclusion, that you use Pop-Stats to generate your statistics."

For example, with regard to the blood on the ointment tube, Soderholm testified that it was consistent with Appleby's and the "probability of selecting an unrelated individual at random from the population whose DNA would match that DNA profile from the tube was 1 in 14.44 billion." And with regard to one of the blood stains from the sports bra, Dowler's testimony indicated that the chances of randomly selecting someone else in the population other than Appleby whose DNA would match the male DNA profile from the bra was "1 in 2 quadrillion."

Appleby filed a motion to exclude the State's DNA evidence, arguing, *inter alia*, that evidence of the application and use of population frequency databases by any witness who is not an expert in that field would violate his right of confrontation. After conducting a hearing, the trial court found that the use of DNA population databases did not present a *Crawford* issue because those databases are not, in and of themselves, testimonial in nature.

The trial court relied on *State v. Lackey*, 280 Kan. 190, Syl. ¶ 5, 120 P.3d 332 (2005), *cert. denied* 547 U.S. 1056 (2006), *overruled on other grounds State v. Davis*, 283 Kan. 569, 158 P.3d 317 (2006), where this court concluded that "[f]actual, routine, descriptive, and nonanalytical findings made in an autopsy report are nontestimonial" and, therefore, "may be admitted without the testimony of the medical examiner" who performed the autopsy. The trial court found:

"The CODIS database simply represents a compilation of DNA information obtained over an extended time period from a large population sample, along with the ability to easily compare any sample with those already compiled. The CODIS database provides routine, descriptive information that, under *Crawford*, is nontestimonial, at least when presented through the testimony of a qualified DNA expert."

Disputing this conclusion, Appleby takes issue with the fact that Soderholm admitted during recross-examination that she did not know who provided the samples for the frequencies or how the databases were made. And although Soderholm had undergone some training regarding CODIS and population genetics, she was admittedly not a statistician.

Appleby, therefore, contends that he had the right to confront a statistician to explain the statistical principles used in the calculations. And he argues that he was denied any opportunity to cross-examine the FBI's random match probability estimates because the witnesses presented at trial did not prepare the database and had no personal knowledge of the methods and procedures the FBI used to compute the statistical estimates or the set of data upon which the calculations were based.

*A. Standard of Review*

Appleby's argument is subject to a de novo standard of review because he challenges the legal basis of the trial court's admission

of evidence, specifically that the evidence was admitted in violation of the Confrontation Clause of the Sixth Amendment to the United States Constitution. *State v. Reid*, 286 Kan. 494, 503, 186 P.3d 713 (2008) (de novo standard applies to review of legal basis of admission of evidence); *State v. Henderson*, 284 Kan. 267, Syl. ¶ 2, 160 P.3d 776 (2007) (de novo standard applies to determination of whether the right to confrontation has been violated).

## B. Testimonial

The starting point for Appleby's Sixth Amendment Confrontation Clause objection is the United States Supreme Court's holding in *Crawford* that the "testimonial statements" of witnesses absent from trial are admissible over a Confrontation Clause objection only when the declarant is unavailable and the defendant has had a prior opportunity to cross-examine the declarant. *Crawford*, 541 U.S. at 68. This analysis altered the prior rule of *Ohio v. Roberts*, 448 U.S. 56, 65 L. Ed. 2d 597, 100 S. Ct. 2531 (1980), *abrogated in Crawford*, 541 U.S. 36, under which a hearsay statement made by an unavailable witness could be admitted without violating the Confrontation Clause if the statement contained adequate guarantees of trustworthiness or indicia of reliability. *Roberts*, 448 U.S. at 66. Post-*Crawford*, the threshold question in any Confrontation Clause analysis is whether the hearsay statement at issue is testimonial in nature. *State v. Brown*, 285 Kan. 261, 285, 173 P.3d 612 (2007).

The Supreme Court did not explicitly define the term "testimonial" in *Crawford*. The Court did state, however, that "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Crawford*, 541 U.S. at 68; see also *Davis v. Washington*, 547 U.S. 813, 822, 165 L. Ed. 2d 224, 126 S. Ct. 2266 (2006) (in context of police interrogations, statements are nontestimonial when made under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency).

Recently, in *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 174 L. Ed. 2d 314, 321-22, 332-33, 129 S. Ct. 2527 (2009), the second

of the cases that led us to stay this opinion pending a United States Supreme Court decision, the Supreme Court held that forensic laboratory certificates of analysis were testimonial and the admission of the certificates without the testimony of the analysts violated a criminal defendant's rights under the Confrontation Clause of the Sixth Amendment. In reaching the conclusion that the certificates were testimonial, the Supreme Court focused on two factors, stating: (1) "The 'certificates' are functionally identical to live, in-court testimony, doing 'precisely what a witness does on direct examination.' [Citation omitted]"; and (2) "the affidavits [were] ' "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." ' [Citation omitted.]" *Melendez-Diaz*, 557 U.S. at 310-11; *cf. Brown*, 285 Kan. at 291 (listing these and other factors to consider in determining if an eyewitness' statement is testimonial).

After finding the laboratory analysts' certificates met these tests to define testimonial hearsay, the *Melendez-Diaz* Court rejected the argument that a different result was justified by the objectivity of the scientific testing and reliability of the test results. The *Melendez-Diaz* majority, discussing this topic in the context of responding to points made by the four dissenting justices, observed:

"This argument is little more than an invitation to return to our overruled decision in *Roberts*, 448 U.S. 56, [100 S. Ct. 2531, 65 L. Ed. 2d 597,] which held that evidence with 'particularized guarantees of trustworthiness' was admissible notwithstanding the Confrontation Clause. *Roberts, Id.* U.S. at 66. What we said in *Crawford* in response to that argument remains true:

" 'To be sure, the Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. . . .

. . . .

" 'Dispensing with confrontation because testimony is obviously reliable is akin to dispensing with jury trial because a defendant is obviously guilty. This is not what the Sixth Amendment prescribes.' *Crawford*, 541 U.S. at 61-62." *Melendez-Diaz*, 557 U.S. at 317-18.

This discussion is particularly relevant in this case because the State argues the scientific, objective nature of the DNA testing and

the statistical probability program means the evidence at issue in this case is nontestimonial. The trial court accepted this argument and partially based its decision on such a rationale, as evidenced by the trial court's reliance on and citation to *Lackey*, 280 Kan. 190, Syl. ¶ 5, which in turn was partially based on the rationale that an autopsy report recorded objective, scientific evidence. *Melendez-Diaz* undercuts this rationale.

Nevertheless, *Melendez-Diaz* does not answer the question of whether there was a Confrontation Clause violation in this case. Here, unlike in *Melendez-Diaz*, the laboratory analysts who performed the DNA testing were in court and subject to cross-examination. The hearsay at issue is the data that was relied on by laboratory analyst Soderholm in reaching her opinion regarding population frequency of specific DNA profiles. The closest the *Melendez-Diaz* Court came to answering this question was to rebut the dissenting justices' argument that the holding would require several individuals from a laboratory to testify. The Court stated:

"[W]e do not hold, and it is not the case, that anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person as part of the prosecution's case. . . . [D]ocuments prepared in the regular course of equipment maintenance may well qualify as nontestimonial records." *Melendez-Diaz*, 557 U.S. at 311 n.1.

While this statement suggests that not all aspects of the testing process are testimonial and therefore subject to a defendant's rights under the Confrontation Clause, the examples differ from the question of whether the data that underlies an expert's opinion is testimonial. Therefore, the decision does not directly answer our question.

Nevertheless, applying the tests utilized in *Melendez-Diaz*, we conclude the population frequency data and the statistical programs used to make that data meaningful are nontestimonial. We first note that DNA itself is physical evidence and is nontestimonial. *Wilson v. Collins*, 517 F.3d 421, 431 (6th Cir. 2008); *United States v. Zimmerman*, 514 F.3d 851, 855 (9th Cir. 2007); see also *Schmerber v. California*, 384 U.S. 757, 765, 16 L. Ed. 2d 908, 86 S. Ct. 1826 (1966) (holding that "blood test evidence, although an incriminating product of compulsion, [is] neither . . . testimony nor

evidence relating to some communicative act or writing" and is therefore not protected by the Fifth Amendment).

Placing this physical evidence in a database with other physical evidence—*i.e.*, other DNA profiles—does not convert the nature of the evidence, even if the purpose of pooling the profiles is to allow comparisons that identify criminals. See 42 U.S.C. §§ 14132(b)(3), 14135e (2006) (stating purposes of CODIS and clearly recognizing use during trial when rules of evidence allow). The database is comprised of physical, nontestimonial evidence. Further, the acts of writing computer programs that allow a comparison of samples of physical evidence or that calculate probabilities of a particular sample occurring in a defined population are nontestimonial actions. In other words, neither the database nor the statistical program are functionally identical to live, in-court testimony, doing what a witness does on direct examination. Rather, it is the expert's opinion, which is subjected to cross-examination, that is testimonial.

At least one other court has reached the same conclusion that the statistical data obtained from CODIS is nontestimonial. See *State v. Bruce*, 2008 WL 4801648 (Ohio App. 2008) (unpublished opinion). More generally, several courts have reasoned that the Confrontation Clause is not violated if materials that form the basis of an expert's opinion are not submitted for the truth of their contents but are examined to assess the weight of the expert's opinion. *E.g.*, *United States v. Lombardozzi*, 491 F.3d 61, 73 (2d Cir. 2007); *United States v. Henry*, 472 F.3d 910, 914 (D.C. Cir. 2007); *United States v. Adams*, 189 Fed. Appx. 120, 124 (3d Cir. 2006) (unpublished opinion); *United States v. Stone*, 222 F.R.D. 334, 339 (E.D. Tenn. 2004); *People v. Sisneros*, 174 Cal. App. 4th 142, 153-54, 94 Cal. Rptr. 3d 98 (2009); *State v. Lewis*, 235 S.W.3d 136, 151 (Tenn. 2007); see Note, *Testimonial Hearsay as the Basis for Expert Opinion: The Intersection of the Confrontation Clause and Federal Rule of Evidence 703 after Crawford v. Washington*, 55 Hastings L.J. 1539, 1540 (2004).

Here, as explained in the testimony in this case, the database and the statistical program are accepted sources of information generally relied on by DNA experts. Based on this scientific data—which by itself is nontestimonial—the experts in this case devel-

oped their personal opinions. See *State v. Dykes*, 252 Kan. 556, 562, 847 P.2d 1214 (1993). These experts were available for cross-examination and their opinions could be tested by inquiry into their knowledge or lack of knowledge regarding the data that formed the basis for their opinion. Consequently, the right to confront the witnesses was made available to Appleby.

The trial court did not err in admitting the opinions of the DNA experts.

## ISSUE 4. JURY INSTRUCTION ON PREMEDITATION

Appleby next contends that the trial court's instruction defining "premeditation," to which Appleby objected at trial, unfairly emphasized the State's theory and violated his right to a fair trial.

### A. *Standard of Review*

When a party has objected to an instruction at trial, the instruction will be examined on appeal to determine if it properly and fairly states the law as applied to the facts of the case and could not have reasonably misled the jury. In making this determination an appellate court is required to consider the instructions as a whole and not isolate any one instruction. *State v. Scott*, 286 Kan. 54, 75, 183 P.3d 801 (2008); *State v. Edgar*, 281 Kan. 47, 54, 127 P.3d 1016 (2006).

### B. *Instruction and Arguments*

The premeditation instruction given in this case tracks substantially with the pattern instruction defining premeditation, PIK Crim. 3d 56.04(b). However, it contains some additional language, and it is this additional language to which Appleby objects. The instruction, with the language added to the PIK instruction in italics, stated:

"Premeditation means to have thought the matter over beforehand. In other words, to have formed the design or intent to kill before the killing. *Stated another way, premeditation is the process of thinking about a proposed killing before engaging in the act that kills another person, but premeditation doesn't have to be present before a fight, quarrel, or struggle begins.* There is no specific time period required for premeditation, but it does require more that the instantaneous, intentional act of taking another person's life. *Premeditation can occur at any*

*time during a violent episode that ultimately causes the victim's death."* (Emphasis added.)

Appleby concedes in his appellate brief that the additional statements in the trial court's definition of premeditation are correct statements of law. See *State v. Gunby*, 282 Kan. 39, Syl. ¶ 9, 144 P.3d 647 (2006) ("Premeditation is the process of thinking about a proposed killing before engaging in the homicidal conduct, but it does not have to be present before a fight, quarrel, or struggle begins. Death by manual strangulation can be strong evidence of premeditation."); *State v. Scott*, 271 Kan. 103, 108, 21 P.3d 516, *cert. denied* 534 U.S. 1047 (2001) ("Premeditation does not have to be present *before* a fight, quarrel, or struggle begins."); see also *State v. Jones*, 279 Kan. 395, 404, 109 P.3d 1158 (2005) (citing *Scott*, 271 Kan. at 111, for the rationale that the jury could find defendant's "state of mind" changed from acting with intent to acting with premeditation "at any time during the violent episode before he caused the victim's death, including at any time during the strangulation").

In fact, the record reflects that the trial court relied on *Gunby*, 282 Kan. 39, which was also a strangulation case, in drafting the instruction. The State suggests the trial judge in this case "believed his instruction was helpful to the jury to give them additional general rules that were not arguing one side or another of the case."

As Appleby notes, however, in *Gunby* the additional language was used in answering a question from the jury, not as part of the initial instruction to the jury. Appleby argues that including the language in the initial instruction unduly favored the State's theory of the case. More fundamentally, he argues it was per se error to deviate from the pattern instruction.

## C. Deviation from Pattern Instruction

First, we address Appleby's general argument that it was inappropriate to deviate from a pattern instruction. Contrary to the implication of this argument, it is not mandatory for Kansas courts to use PIK instructions, although it is strongly advised. *State v. Mitchell*, 269 Kan. 349, 355-56, 7 P.3d 1135 (2000). As this court has stated:

"The pattern jury instructions for Kansas (PIK) have been developed by a knowledgeable committee to bring accuracy, clarity, and uniformity to jury instructions. They should be the starting point in the preparation of any set of jury instructions. If the particular facts in a given case require modification of the applicable pattern instruction or the addition of some instruction not included in PIK, the trial court should not hesitate to make such modification or addition. However, absent such need, PIK instructions and recommendations should be followed." *State v. Johnson*, 255 Kan. 252, Syl. ¶ 3, 874 P.2d 623 (1994).

Hence, we find no merit to Appleby's argument that error occurred simply because the trial court deviated from the pattern instruction.

### D. Undue Emphasis

Second, we address Appleby's contention that the alteration to a PIK instruction may not single out and give undue emphasis to particular evidence, even if it correctly states the law. To support his argument, Appleby advances *State v. Cathey*, 241 Kan. 715, 741 P.2d 738 (1987), *disapproved on other grounds State v. Schoonover*, 281 Kan. 453, 133 P.3d 48 (2006).

In *Cathey*, the jury was instructed that evidence that a defendant had fled soon after the commission of the alleged offense could be considered as evidence of guilt if the jury found the defendant fled to avoid arrest and trial. The *Cathey* court observed that the instruction was a correct statement of the law; evidence to establish the defendant's consciousness of guilt such as flight, concealment, fabrication of evidence, or the giving of false information is admissible as evidence in a criminal case. *Cathey*, 241 Kan. at 730. But the *Cathey* court held it was clearly erroneous for the trial court to instruct the jury on the defendant's consciousness of guilt by flight because in *State v. McCorgary*, 218 Kan. 358, 365, 543 P.2d 952 (1975), *cert. denied* 429 U.S. 867 (1976), the court directed that in subsequent trials the entire instruction on consciousness of guilt should be omitted from the instructions to the jury; the *Cathey* court noted that the reason the instruction had been disapproved is that it emphasized and singled out certain evidence admitted at a criminal trial. *Cathey*, 241 Kan. at 730-31.

In responding to Appleby's reliance on *Cathey*, the State makes two arguments. First, the State points out that *Cathey* was distin-

guished in *State v. Williams*, 277 Kan. 338, 85 P.3d 697 (2004). Second, the State argues *Cathey* can also be distinguished because the instruction in this case merely provides a correct legal definition of the term "premeditation" rather than instructs the jury how to apply the evidence as did the *Cathey* instruction.

Regarding the first point, the State is correct—*Williams* does distinguish *Cathey*. See *Williams*, 277 Kan. at 352-53. However, the distinction made in *Williams* bolsters Appleby's argument that there is a difference between emphasizing a theory when answering a question from a jury and when giving the initial instructions.

In *Williams*, as in *Gunby*, the defendant argued that the trial court erred in responding to the jury's question about premeditation. During its deliberations, the *Williams* jury asked: "How long beforehand does the thought have to occur to make it premeditation?"; the word "beforehand" was circled. *Williams*, 277 Kan. at 351. While the court responded that no particular amount of time was required, the jury later sought a more detailed definition of premeditation. It asked whether premeditation included a preconceived plan and asked for an explanation of the relationship between intent and premeditation. The trial court responded with a correct statement of law, which was taken from *State v. Jamison*, 269 Kan. 564, 571-72, 7 P.3d 1204 (2000).

Williams, citing *Cathey*, 241 Kan. at 730-31, argued that the trial court's second response, without mention of his mental defect, emphasized the weight of the State's evidence of premeditation and, by the same token, deemphasized the weight of his evidence of mental defect. The *Williams* court found this reliance on *Cathey* to be faulty in that a response to an inquiry, unlike an instruction, is formulated in response to the particular question asked by the jury. A trial court's task in responding to an inquiry is to provide guidance with regard to the subject of the inquiry. "If the subject of the inquiry involves primarily the evidence of one party," said the *Williams* court, "the trial court may be hard pressed, in drafting a helpful response, to avoid singling out and emphasizing the weight of any party's evidence." *Williams*, 277 Kan. at 353. The *Williams* court concluded that the trial court appropriately gave a response that was formulated to help the jury understand premed-

itation, which had been the specific question asked by the jury. Furthermore, the *Williams* court stated that if the defendant had wanted the trial court to remind the jury of the mental defect or disease defense, he could have made a request to include the mental defect instruction among those the trial court asked the jury to reread. The *Williams* court held that there was no abuse of discretion. *Williams*, 277 Kan. at 353. As Appleby notes, however, the issue arises in this case because of the trial court's initial instructions, not because of an answer to a jury question.

The State recognizes this difference but argues the trial court was stating the law without emphasizing one side of the case or the other. To support this suggestion, the State cites *State v. Green*, 245 Kan. 398, 781 P.2d 678 (1989), which in turn is based on *State v. Beebe*, 244 Kan. 48, 766 P.2d 158 (1988). The State argues these cases suggest that the rationale of *Cathey* does not apply in this case because in *Cathey*, the instruction told the jury how to *apply* certain evidence in assessing the defendant's guilt or innocence and in this case as in *Green* and *Beebe*—the instruction merely provided the legal *definition* of an element of the crime or factors to be considered. We agree this is a valid distinction and, in this regard, find *Beebe* to be the most analogous and helpful case for purposes of our analysis.

In *Beebe*, the defendant, who was appealing his jury trial convictions of first-degree murder and aggravated kidnapping, argued the trial court erred in instructing the jury it could infer malice, premeditation, and deliberation from the use of a deadly weapon in the killing. The *Beebe* court concluded it was error to instruct that premeditation and deliberation could be inferred from the use of a deadly weapon because that fact, standing alone, does not support such an inference. Rather, a gun could be used to kill in first-degree murder, second-degree murder, voluntary manslaughter, or involuntary manslaughter. *Beebe*, 244 Kan. at 58.

On the other hand, the portion of the instruction relative to the inference of malice was upheld. Unlike the premeditation portion, the malice portion was an accurate statement of the law, and the *Beebe* court pointed out that the instruction did not require or direct that malice be found from the use of a deadly weapon. The

court stated: "The use of a deadly weapon is one of the evidentiary facts from which the jury could infer malice, but we conclude it is the better practice not to give a separate instruction thereon." *Beebe*, 244 Kan. at 60.

As in *Beebe*, the jury instruction defining premeditation in this case contained valid statements of Kansas law. While those statements of the law were added because of the facts of the case, they did not direct the jury to a result. In other words, in contrast to the instruction at issue in *Cathey*—where the instruction stated that evidence of flight could be considered as evidence of guilt—there was no statement in the instruction at issue in this case that evidence of a prolonged struggle or of strangulation could be considered as evidence of premeditation. Rather, the added language explained the law recognizing that premeditation must be present before the homicidal conduct but does not have to be present before a struggle begins.

Further, Appleby fails to show that the jury instruction in this case misled the jury or prejudiced him. Certainly, the instruction included an explanation of premeditation that Appleby would like to ignore; he would have liked the jury to have believed he had to have premeditated the murder before he entered the pool pump room because there was no evidence to support such a finding, while there was direct and overwhelming evidence of premeditation formed before A.K.'s death. A.K. suffered a severe beating in which she sustained numerous cuts, bruises, and lacerations. And the back of A.K.'s head was bashed open in two places. Blood from A.K. and Appleby was found mixed together. There was evidence of both manual strangulation and ligature strangulation. According to expert testimony, it would have taken approximately 10 minutes—and perhaps as many as 16 minutes—for Appleby to strangle A.K. There were some periods when the force of strangulation was stopped, causing petechial hemorrhaging. The law supports a conclusion that under those facts there could have been premeditation, and the instruction merely informed the jury of that law. It did not direct them how to apply the evidence or unduly emphasize the State's case.

While we again emphasize that trial courts should follow the pattern instructions whenever possible, we find no error in the premeditation instruction given in this case.

### ISSUE 5. HARD 50 SENTENCE: WEIGHING AGGRAVATING AND MITIGATING FACTORS

Next, Appleby argues the trial court abused its discretion in weighing the aggravating and mitigating circumstances in determining whether to impose the hard 50 sentence. Specifically, he contends that in weighing the circumstances, the court improperly viewed some of the mitigating evidence as being a negative or aggravating factor.

When reviewing the imposition of a sentence of life imprisonment without the possibility of parole for 50 years, an appellate court reviews the sentencing court's weighing of aggravating and mitigating circumstances under an abuse of discretion standard. *State v. Jones*, 283 Kan. 186, 215, 151 P.3d 22 (2007); *State v. Engelhardt*, 280 Kan. 113, 144, 119 P.3d 1148 (2005).

Because the crime in this case occurred in June 2002, the applicable sentencing statute is K.S.A. 2001 Supp. 21-4635(a), which provided in part:

"[I]f a defendant is convicted of the crime of capital murder and a sentence of death is not imposed, . . . the court shall determine whether the defendant shall be required to serve . . . for crimes committed on and after July 1, 1999, a mandatory term of imprisonment of 50 years or sentenced as otherwise provided by law."

K.S.A. 2001 Supp. 21-4635(b) directs the sentencing court to consider evidence of aggravating and mitigating circumstances in determining whether to impose a hard 50 sentence. If the court finds that one or more of the aggravating circumstances enumerated in K.S.A. 2001 Supp. 21-4636 exist and that the existence of such aggravating circumstances is not outweighed by any mitigating circumstances, the defendant "shall" receive the hard 50 sentence. K.S.A. 2001 Supp. 21-4635(c).

Here, the sentencing court found that one aggravating circumstance existed—the defendant committed the crime in an especially heinous, atrocious, or cruel manner. K.S.A. 2001 Supp. 21-

4636(f). As a basis for the aggravating circumstance, the court found (1) there was infliction of mental anguish or physical abuse before the victim's death and (2) there were continuous acts of violence before and continuing after the killing. K.S.A. 2001 Supp. 21-4636(f)(3), (5). Appleby does not raise any arguments disputing these findings.

At sentencing, Appleby asserted two statutory mitigating circumstances. See K.S.A. 21-4637 ("Mitigating circumstances shall include, but are not limited to" the listed factors.). First, he argued he was under the influence of extreme mental and emotional disturbances at the time of the incident. K.S.A. 21-4637(b). Second, Appleby contended his capacity to appreciate the criminality of his conduct and conform his conduct to the requirements of the law was substantially impaired because of his mental condition at the time of the incident. K.S.A. 21-4637(f). He also presented nonstatutory mitigating evidence that he was exposed to violence, substance abuse, lawless behavior, and abandonment during his youth.

At the sentencing hearing, Appleby presented the testimony of two experts, Dr. David George Hough, a clinical psychologist, and Dr. Edward Robert Friedlander, a board-certified anatomical and clinical pathologist.

Dr. Hough, who conducted psychological testing on Appleby, diagnosed him with intermittent explosive disorder, which Dr. Hough explained, is recognized as a mental disease or defect. According to Dr. Hough, such behavior is "driven by uncontrolled emotion, mainly rage," and it is "manifested by such correlates as hyperarousal, a collapse of thinking or cognitive mediation." Focusing on the crime in this case, Dr. Hough opined that "something got kindled inside [Appleby], and what got kindled was this enormous rage that was way out of proportion to anything [A.K.] could have said or done. . . . The best I can tell is that this was not planned or organized or premeditated or rehearsed." Dr. Hough concluded that Appleby did not have complete control of himself during the event.

Dr. Friedlander gave expert opinion testimony regarding the events in the pool pump room. He did not view the crime scene or the autopsy, but he reviewed the report of Dr. Handler, who

performed the autopsy in this case, spoke with Dr. Handler, and reviewed some of Dr. Handler's microscopic slides. Dr. Fried-lander testified that in his opinion, A.K. was knocked out when she fell to the ground after being struck only one or two times in the mouth. Dr. Friedlander further opined that Appleby punched both of A.K.'s eyes while she was on the ground, unconscious. And he testified that he did not see evidence of petechial hemorrhaging; thus, one could not say with certainty how long A.K. had been strangled.

Appleby contends that the sentencing court did not give proper weight to his mitigating circumstances and went so far as to use the mental disorder as an aggravating circumstance against him in the balancing equation. He is specifically bothered by the court's asking at the sentencing hearing why the mental disorder was not an aggravating circumstance: "If [Appleby] has intermittent explosive disorder and is prone to strong outpourings of rage and behavior far out of proportion to anything that occurs to him, why is that a reason for a lesser sentence instead of a greater sentence?" Defense counsel explained immediately, however, that it would show "he was not necessarily in control of his actions like the rest of us would be." The court then pointed to the jury's finding that the crime was premeditated. The court was clearly trying to understand how the two concepts could coexist.

Appleby also points to this statement in the court's sentencing memorandum: "To the extent that the defendant has 'intermittent explosive disorder,' as testified to by Dr. George Hough, that does not suggest a need to lock the defendant up for a shorter, rather than a longer, period." But Appleby fails to look at the surrounding context. In the preceding sentences, the court states that it gave "due consideration" to the mitigating circumstances presented by the defense, including the evidence, affidavits, and letters submitted by the defense. Then, in the sentence on which Appleby focuses, the court's statements regarding Dr. Hough's testimony suggest that the court *was* looking at the evidence as presented—mitigating circumstances. In the next sentence, the court indicates that Dr. Hough's testimony failed to explain the defendant's premeditated conduct, despite ample evidence to support the jury's

verdict. Nowhere did the court say or even imply that Appleby was going to receive a longer sentence due to his alleged mental defect.

Appleby contends that the present case is similar to *Miller v. State*, 373 So. 2d 882, 885 (Fla. 1979), in which the Florida Supreme Court vacated the trial court's sentence of death because the trial court "considered as an aggravating factor the defendant's allegedly incurable and dangerous mental illness." In addition, Appleby cites *Zant v. Stephens*, 462 U.S. 862, 77 L. Ed. 2d 235, 103 S. Ct. 2733 (1983), which expressly left open the possibility that in a "weighing" state, infection of the process with an invalid aggravating factor might require invalidation of a death sentence. Both of these cases are inapplicable; in this case, the trial court considered the factor as a mitigator and did not improperly consider the factor as an aggravating circumstance.

The final authority advanced by Appleby is *State v. Legendre*, 522 So. 2d 1249 (La. App. 1988), where the defendant was convicted of second-degree battery and received 5 years of hard labor, the maximum sentence. The evidence supported the conclusion that the defendant had the necessary specific intent to inflict serious bodily injury on the victim. According to Louisiana law, maximum sentences could "be justified only in cases classified as 'extreme' by the factual circumstances of the offense and the apparent [dangerousness] of the defendant." *Legendre*, 522 So. 2d at 1252.

The sentencing court had evidence that the defendant was a chronic paranoid schizophrenic, and Louisiana case law indicated that mental illness should be used as a mitigating circumstance. See *Legendre*, 522 So. 2d at 1252. The Louisiana appellate court found that the trial court did not consider the defendant's mental condition a mitigating circumstance in imposing the sentence. Instead, the trial court seemed to consider it an aggravating circumstance by stating that the defendant's main problem was " 'his lack of insight to his illness and his refusal to take prescribed medication away from the hospital.' " *Legendre*, 522 So. 2d at 1253. The case was remanded for resentencing, the appellate court holding that when a person with a recognized, diagnosed mental illness is convicted of crimes, that condition should be considered to mitigate

the type and length of sentence imposed on the offender, "even if he has been ruled legally sane." *Legendre*, 522 So. 2d at 1253.

The laws in *Legendre* are inapplicable to the present case. Appleby essentially argues that the court failed to properly and carefully consider the mitigating evidence and, instead, focused only on evidence supporting the aggravating circumstance. But the sentencing court's comments clearly show that the court did properly consider and weigh the defendant's mitigators.

In this case, the trial court simply found that the State's aggravating circumstance outweighed the defendant's mitigating circumstances. It is well established that " '[w]eighing aggravating and mitigating circumstances is not a numbers game. "One aggravating circumstance can be so compelling as to outweigh several mitigating circumstances" ' and vice versa. [Citations omitted.]" *Engelhardt*, 280 Kan. at 144.

Appleby has failed to establish an abuse of discretion.

### ISSUE 6. HARD 50 SENTENCE: CONSTITUTIONALITY

Appleby contends that the hard 50 sentencing scheme is unconstitutional because it permits the sentencing court to find facts that enhance the available sentencing range, utilizing a preponderance of the evidence standard, in violation of *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000).

This court has repeatedly rejected similar arguments challenging the constitutionality of the hard 40/hard 50 sentencing scheme and held our hard 50 scheme is constitutional. *State v. Johnson*, 284 Kan. 18, 22-23, 159 P.3d 161 (2007), *cert. denied*, 169 L. Ed. 2d 737 (2008); see also *State v. Warledo*, 286 Kan. 927, 954, 190 P.3d 937 (2008) (reaffirming *State v. Conley*, 270 Kan. 18, 11 P.3d 1147 [2000], citing *Johnson* with approval, and noting that the United States Supreme Court has not "altered decisions in which it recognized that the [*Apprendi*] prohibition does not apply when considering the minimum sentence to be imposed"); *State v. Albright*, 283 Kan. 418, 424, 153 P.3d 497 (2007). Appleby presents no persuasive reason to abandon this long line of precedent.

Affirmed in part, reversed in part, and sentence vacated in part.

MCFARLAND, C.J., not participating.

DANIEL L. LOVE, District Judge, assigned.

❊ ❊ ❊

JOHNSON, J., concurring in part and dissenting in part: Beginning with the suppression issue, I first acknowledge the majority's thorough and thoughtful analysis of the more recent post-*Miranda* decisions. In my view, such a detailed synthesization of the cases is testament to the manner in which appellate courts have worked diligently and creatively to unnecessarily complicate, and thus emasculate, the straight-forward directive, pronounced in *Miranda* some 43 years ago and quoted by the majority, that "a pre-interrogation request for a lawyer . . . affirmatively secures [the] right to have one." *Miranda v. Arizona*, 384 U.S. 436, 470, 16 L. Ed. 2d 694, 86 S. Ct. 1602, *reh. denied* 385 U.S. 890 (1966). Nevertheless, even in the current environment, I would find that Appleby effectively invoked his Fifth Amendment right to counsel.

First, I would not require a detainee to possess the knowledge of a constitutional scholar well-versed in Fifth and Sixth Amendment jurisprudence. Rather, I would view the circumstances from the perspective of an objectively reasonable layperson interacting with an objectively reasonable law enforcement officer. In that context, even though only the officer knew that the arrest was pretextual, both could not have questioned that Appleby was actually in custody on the 6-year-old Connecticut charges, so as to trigger the protections applicable to custodial interrogations.

In that setting, Appleby asked Detective Jewiss about consulting with an attorney not once, but four times. The trial court found that Appleby had asserted his right to an attorney, albeit perhaps only for Sixth Amendment purposes. The majority questions, but does not decide, whether the wording of Appleby's requests was

sufficient to support the trial court's finding. Without belaboring the point, I would simply submit that one might expect a detainee, who has been confronted in his home by a multitude of armed officers, arrested, and taken to jail, to propound a request for an attorney in a most polite and nonconfrontational manner. Moreover, Appleby's persistence in making a number of requests in a short period of time belies any equivocation as to his desire to have an attorney present or as to Detective Jewiss' understanding of that desire.

Granted, the majority discards two of Appleby's requests; one because it was made prior to his receiving the *Miranda* warnings and one because it was tied to the execution of the DNA search warrant. Even without those requests, however, Appleby still asked about consulting with an attorney twice after receiving the following Notice of Rights:

"1. You are not obligated to say anything, in regard to this offense you are charged with but may remain silent.

"2. Anything you may say or any statements you make may be used against you.

"3. You are entitled to the services of an attorney.

"4. If you are unable to pay for the services of an attorney you will be referred to a Public Defender Office where you may request the appointment of an attorney to represent you.

"5. You may consult with an attorney before being questioned, you may have an attorney present during questioning and you can not be questioned without your consent. X [Initialed:] BA

"6. (*Not applicable if you were arrested on a Superior Court Warrant which specified that bail should be denied or which ordered that you be brought before a clerk or assistant clerk of the Superior Court.*)

You have a right to be promptly interviewed concerning the terms and conditions of your release pending further proceedings, and upon request, counsel may be present during this interview."

A reasonably intelligent person could not read the plain language of paragraph 3 of that form and know, or even guess, that the "services of an attorney" to which he or she is facially unequivocally entitled are, as a matter of law, divided into two categories, *i.e.*, Fifth Amendment services and Sixth Amendment services. Accordingly, a detainee would need to possess excellent clairvoyance—or astute constitutional acumen—to ascertain that, if there

is any way in which the detainee's request for an attorney might be construed as being for Sixth Amendment purposes, then the right would not actually accrue or the request become effective until some undisclosed later time, after the detainee has been subjected to a custodial interrogation.

Likewise, the language of paragraph 5 would not, on its face, be confusing to a layperson. The detainee may consult with an attorney *"before being questioned"*; then the detainee may have an attorney present *"during questioning"*; but ultimately, the detainee may withhold consent to be questioned at all. However, from a temporal standpoint, a detainee dare not take his or her stated rights literally at the risk of being legally sandbagged. Under the authority cited by the majority, the right to consult with an attorney may be validly asserted only when authorities are conducting a custodial interrogation or when such interrogation is imminent. See 2 LaFave, Israel, King & Kerr, Criminal Procedure § 6.9(g), p. 869 n.200 (3d ed. 2007). In other words, contrary to the plain language in the Notice of Rights, an attempt to exercise of the right to "consult with an attorney *before* being questioned" will be deemed invalid as anticipatory, unless it is asserted *during* questioning.

Appleby faced one more explosive in the minefield that lay between the receipt of the Notice of Rights and the exercise of those rights. The form told Appleby that he could have an attorney present during questioning. Detective Jewiss propounded questions to Appleby during the book-in process, and Appleby twice asked about consulting an attorney while answering those questions. The majority flicks away that circumstance as not being an "interrogation," noting parenthetically that the courts have recognized a " 'routine booking question' " exception to *Miranda* for questions designed to obtain the " ' "biographical data necessary to complete booking or pretrial services." ' " *Pennsylavania v. Muniz*, 496 U.S. 582, 601, 110 L. Ed. 2d 528, 110 S. Ct. 2638 (1990).

How was Appleby to know of this court-made exception? The Notice of Rights form did not suggest any exceptions. Detective Jewiss' self-serving testimony that he advised Appleby that someone else would be talking to him about the case does not change the fact that Detective Jewiss was "questioning" Appleby, even if

it was not a legal interrogation for *Miranda* purposes. Moreover, the distinction between booking questions and case interrogation is less defined in this case, given that part of the biographical data, specifically Appleby's use of an alias, was to be an integral part of the prosecution. Nevertheless, I reject the notion that Appleby's invocation of his right to an attorney, made while he was in custody and being questioned by a law enforcement officer, was an anticipatory request that did not manifest an intent to have an attorney present during questioning, as he had been advised was his right.

Under the circumstances of this case, I would find that Appleby effectively invoked his Fifth Amendment right to counsel with respect to the Connecticut charges and in conformance with the Notice of Rights he had been given in that case. As the majority notes, *McNeil v. Wisconsin*, 501 U.S. 171, 176-77, 115 L. Ed. 2d 158, 111 S. Ct. 2204 (1991), instructs us that Appleby could not thereafter be approached for further interrogation by the Kansas detectives. Accordingly, I would reverse the denial of the suppression motion.

I concur with the majority's result on the other issues. However, I feel compelled to voice my concerns, or perhaps merely display my lack of comprehension, on the stated law applicable to the double jeopardy and premeditation issues.

The majority notes that a constitutional claim of double jeopardy arises when a defendant is actually punished more than once for committing one offense. It then turns to the *State v. Schoonover*, 281 Kan. 453, 133 P.3d 48 (2006), paradigm of applying the strict-elements test to a unitary conduct, multiple-description scenario to determine what constitutes one offense. The rationale for that approach is to "implement the legislative declaration in [K.S.A. 21-3107] that a defendant may be convicted of two crimes arising from the same conduct unless one is a lesser included offense of the other." *Schoonover*, 281 Kan. at 498. In other words, if a person commits a single act, rather than two acts of discrete conduct, that person may be punished as many times as the legislature may dictate through its definition of the elements of various crimes.

In my view, that is tantamount to letting the tail wag the dog in the arena of constitutional jurisprudence. Under the separation of powers doctrine, the judiciary is to interpret the Constitution, *i.e.,*

determine whether a person is being unconstitutionally subjected to multiple punishments, rather than abdicating that responsibility to the legislature. To the contrary, by developing a test that implements K.S.A. 21-3107, we have permitted the legislature to tell the judiciary that the prohibition against multiple punishments guaranteed by the Double Jeopardy Clauses of our state and federal Constitutions simply does not apply in this state, unless perhaps a lesser included offense is involved. For instance, the legislature could effect a multiple punishment in nearly every speeding or other traffic infraction case by creating the crime of possessing a motor vehicle with the intent to use it to commit a traffic offense. See *State v. Cooper*, 285 Kan. 964, Syl. ¶¶ 3, 4, 179 P.3d 439 (2008) (offense of manufacturing methamphetamine does not have the same elements as offense of using drug paraphernalia to manufacture methamphetamine; multiple punishments for the same conduct is constitutional so long as the crimes have different elements). I simply cannot accept that constitutional rights are to be determined by the legislature.

Finally, tilting at one last windmill, I must express my frustration with the complete adulteration of the rather simple concept of premeditation. In my view, that concept was aptly described in a portion of the definition proffered in *State v. Gunby*, 282 Kan. 39, Syl. ¶ 9, 144 P.3d 647 (2006), which stated that "[p]remeditation is the process of thinking about a proposed killing before engaging in the homicidal conduct." Unfortunately, that case, and others, have gone further by opining that premeditation does not have to be present before the commencement of a fight, quarrel, or struggle and declaring that manual strangulation is strong evidence of premeditation. 282 Kan. 39, Syl. ¶ 9. Apparently, the suggestion is that, even though a killer may commence the homicidal conduct of manual strangulation without having thought over the matter beforehand, he or she may be deemed to have premeditated the killing if there is a possibility that the killer ruminated upon what he or she was doing *during* the murderous act, but before it actually caused the victim's death. To the contrary, I would find that premeditation, as the very word contemplates, requires that the matter be thought over *before* commencement of the homicidal conduct,

whether the killing method be shooting, stabbing, strangulation, or some other means. Nevertheless, I concur with the majority in this case because of the evidence supporting two instances of strangulation, which would allow for a period of time to premeditate the killing before commencing the second, fatal strangulation.