(242 P.3d 1223)
No. 101,300

STATE OF KANSAS, *Appellee*, v. CORY T. ELKINS, *Appellant*.

Opinion
filed November 19, 2010.

*Heather Cessna*, of Kansas Appellate Defender Office, for appellant.

*Nicole Romine*, assistant district attorney, *Megan McGinnis*, legal intern, *Charles E. Branson*, district attorney, and *Steve Six*, attorney general, for appellee.

Before MARQUARDT, P.J., MCANANY and CAPLINGER, JJ.

MCANANY, J.: Cory Elkins was convicted in May 2008 of multiple counts of rape and aggravated criminal sodomy as a result of attacks in Lawrence on J.L. in 1994 and on E.L. in 1995. Neither victim could identify her attacker. However, there were a number of similarities regarding the manner in which the two attacks occurred. Both victims were examined at the hospital and DNA samples were collected.

The Kansas Bureau of Investigation (KBI) analyzed the samples and entered the DNA profiles into the national database known as the Combined DNA Indexing System (CODIS). In 2006, CODIS generated a match between E.L.'s case and J.L.'s case, indicating that the attacker in each case was likely the same person. Elkins had been incarcerated in California, which resulted in his DNA profile being entered into the database. CODIS generated a match between Elkins and the J.L. and E.L. samples.

The KBI informed Lawrence detectives about the DNA matches. The detectives obtained a DNA sample from Elkins in California. The KBI tested the sample and confirmed that Elkins' DNA profile matched the DNA profile of the attacker in both attacks. Elkins was then charged with rape and aggravated criminal sodomy of both J.L. and E.L.

Before trial, Elkins moved in limine to exclude evidence about the CODIS match linking him to the attacks. The trial court denied the motion but limited the State to presenting the CODIS evidence only for the purpose of explaining the actions the investigators took before arresting Elkins.

It was discovered before trial that during her analysis of the DNA samples the KBI's DNA analyst, Sindey Schueler, had contaminated samples from E.L.'s case with some of Schueler's own DNA. Schueler testified at trial that the contamination occurred during an examination in 1996, that the contamination was accidental, and that the contamination did not invalidate the result of her test. Her test indicated that Elkins contributed DNA to the samples taken from E.L. Schueler explained that her own DNA was not an alternative male DNA source. Because Elkins was the only identifiable

male contributor in the contaminated E.L. slides, Schueler explained, her identification of Elkins' DNA was still reliable.

In the course of her testimony, Schueler described locating Elkins' DNA profile on the CODIS "offender index." Elkins objected and moved for a mistrial. The trial court denied the motion but ordered the State to instruct Schueler to refrain from using the term "offender" in describing the database. Thereafter, no one referred to CODIS as the "offender index" for the remainder of the trial. No limiting instruction was requested or given.

Finally, during the State's cross-examination of Dean Stetler, Elkins' DNA expert, Stetler testified that his findings were based on his review of the records as opposed to any testing of samples. He stated that on occasion he did testing in his lab but did not have any written quality assurance protocols. He testified, "In a research lab, you always have the luxury of being able to repeat an analysis. So everything is repeated at least twice. That's our quality assurance. If we come up with the same answer more than once, we can be assured that our answer is valid." The prosecutor then asked Stetler if he asked to retest any of the samples in either E.L.'s or J.L.'s case.

Elkins objected and moved for a mistrial, contending that the question improperly shifted the burden of proof onto the defendant. The court overruled the objection and refused to grant a mistrial. Stetler then answered the question, stating that he did not request samples for retesting because from his review of the documents "there wasn't anything left to retest of the critical samples."

The jury convicted Elkins on all counts, and the court denied his request for a new trial. Elkins appeals.

## Right of Confrontation

Elkins argues that allowing Schueler to testify about the CODIS "hit" linking him to the crimes violated his Sixth Amendment right to confrontation. Elkins argues that the "hit" was testimonial under *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). He compares his case to the KBI drug reports at issue in *State v. Laturner*, 289 Kan. 727, 218 P.3d 23 (2009). Elkins asserts that the confrontation violation occurred here because he

was not able to cross-examine the CODIS analyst from California who entered his DNA into the database. He argues that even though the State was prohibited from using the term "match" to describe the database's connection between Elkins and the Lawrence rapes, the reference to a "hit" was readily perceived by the jury as the functional equivalent.

Elkins argues that the confrontation violation was not harmless error because the State used the CODIS match to bolster or corroborate Schueler's analysis, which was not credible because of the contamination problem.

Elkins' confrontation argument against the CODIS "hit" testimony was presented to the trial court in Elkins' motion in limine and again at trial in objections to the admission of testimony. We review these trial court rulings for any abuse of discretion. See *State v. Abu-Fakher*, 274 Kan. 584, 594, 56 P.3d 166 (2002). We examine de novo the legal issue of whether admission of the CODIS evidence violated Elkins' right of confrontation. See *State v. Appleby*, 289 Kan. 1017, 1054-55, 221 P.3d 525 (2009).

There was extensive testimony from both sides on the DNA evidence. The witnesses providing that testimony were available for extensive cross-examination.

Myrl Roberts, a nurse at Lawrence Memorial Hospital, testified about the procedure for taking and preserving the victim's clothing and obtaining DNA swabs from J.L. and preserving the material obtained on slides. Barbara Parker, another nurse at Lawrence Memorial Hospital, testified to the procedure for collecting E.L.'s clothing and obtaining DNA samples from E.L.

Laura Kwart worked for the KBI doing screening of rape kits in order to identify seminal fluid. She testified to the procedures she used to extract sperm cells from samples and to preserve the results.

Sindey Schueler, the supervisor who oversees DNA testing by the KBI, testified about the procedure for extracting DNA from material collected when a victim is examined at the hospital following a rape. She did the DNA extraction and analysis on samples from both J.L. and E.L.

Schueler testified that seminal fluid was found on an item of J.L.'s clothing, a chair pad, and a washcloth. In April 2004, she conducted a DNA extraction from the retained evidence samples. In February 2006, she put the DNA profiles she obtained from J.L. in this extraction process into the CODIS database "to see if a possible investigative lead could be generated." As a result, Schueler obtained a "hit"; that is, the DNA profiles from the J.L. specimens led to another sample in the database: the DNA profile from E.L. which Schueler had entered into the database earlier.

Schueler testified that the DNA profile obtained in E.L.'s case came from seminal fluid identified on the vaginal and rectal swabs obtained at the hospital following her attack. Schueler extracted the DNA from these swabs and generated a DNA profile, which she entered into the CODIS database.

Apparently, at some point Elkins' DNA was entered into the CODIS database following his arrest on unrelated charges in Sacramento, California.

Schueler testified that in November 2006, she obtained another "hit" on the CODIS database which provided Elkins' name as a possible investigative lead in both J.L.'s case and E.L.'s case. Lawrence Police Detective Lance Flachsbarth testified that his police department was notified that "a suspect was developed" through DNA in both rape cases, and Flachsbarth went to California to obtain a DNA sample from Elkins. Flachsbarth obtained the sample using a cotton swab and delivered it to the KBI.

Schueler testified that she received the sample from Flachsbarth and conducted the procedures to extract Elkins' DNA and generate a genetic profile. She compared the Elkins profile to the male DNA sample obtained from J.L.'s clothing and the chair pad. She testified that Elkins was the likely source of the DNA found on the chair pad. The chance that Elkins is not the source is 1 in 131 billion.

Elkins claims his confrontation rights were violated when he did not have an opportunity to examine the person in California who took his DNA sample and entered it in the CODIS database.

With that, we turn to our Supreme Court's decision in *Appleby*. *Appleby* involved the rape and murder of a young college student

who worked at a swimming pool in Leawood. Appleby was apprehended in Connecticut where the police obtained a DNA sample from him. DNA testing by two crime labs matched Appleby's DNA to DNA taken from the victim's body. Our Supreme Court considered whether the admission of evidence from the CODIS database violated Appleby's confrontation rights. The court stated:

"We first note that DNA itself is physical evidence and is nontestimonial. *Wilson v. Collins*, 517 F.3d 421, 431 (6th Cir. 2008); *United States v. Zimmerman*, 514 F.3d 851, 855 (9th Cir. 2007); see also *Schmerber v. California*, 384 U.S. 757, 765, 86 S. Ct. 1826, 16 L. Ed. 2d 908 (1996) (holding that 'blood test evidence, although an incriminating product of compulsion, [is] neither . . . testimony nor evidence relating to some communicative act or writing' and is therefore not protected by the Fifth Amendment).

"Placing this physical evidence in a database with other physical evidence—*i.e.*, other DNA profiles—does not convert the nature of the evidence, even if the purpose of pooling the profiles is to allow comparisons that identify criminals. . . . The database is comprised of physical, nontestimonial evidence." *Appleby*, 289 Kan. at 1057-58.

The cases relied upon in the court's opinion in *Appleby* relate to whether a defendant's Fifth Amendment right not to be compelled to testify against himself is violated when the defendant is compelled to give a saliva or blood sample for the purpose of preserving the defendant's DNA. As the court noted in *Schmerber*, "blood test evidence, although an incriminating product of compulsion, [is] neither . . . testimony nor evidence relating to some communicative act or writing." 384 U.S. at 765. As noted in *Wilson*, "a DNA sample is analogous to a photograph or fingerprint, another form of physical evidence identifying an individual that falls outside the scope of Fifth Amendment protection." 517 F.3d at 431.

Elkins complains that he had no confrontation opportunity with respect to the testimony of a CODIS "hit" because the California police or prison person who took his DNA sample is not available for cross-examination. He cites *State v. Henderson*, 284 Kan. 267, Syl. ¶ 3, 160 P.3d 776 (2007), for the proposition: "If the declarant is unavailable to testify at trial, and the declarant's statement is testimonial, then the testimony is not admissible unless the defendant had a prior opportunity to cross-examine the declarant."

This begs the question: who is the declarant Elkins had no opportunity to confront? There was no testimony at trial about any statement or declaration by any California official. In fact, there was no trial testimony whatsoever about how Elkins' DNA got into the CODIS database. Further, if the act of Elkins allowing a DNA swab to be taken from him is not testimonial, the act of entering Elkins' DNA information into the database is likewise nontestimonial.

The CODIS database consists of two elements: (1) the data contained in the database, and (2) the computer program and the algorithms by which the computer manipulates the data so as to enable it to recognize and to report similar items of datum. In *Appleby*, the defendant claimed the court erred in admitting into evidence the computer-generated report which indicated that there was only a one in two quadrillion probability of randomly selecting someone in the population other than Appleby whose DNA would match the DNA found on the victim's garment. Thus, Appleby's challenge was to the computer program at work in the CODIS database. However, the court in *Appleby* made clear not only that the statistical calculations obtained from CODIS are not testimonial, but that the DNA data in the database itself are not testimonial. 289 Kan. at 1058.

An analogue to the present issue can be expressed in the following scenario. The prosecution witness testifies that he saw the defendant at the scene and looked at the clock on the wall to determine it was 2 p.m. The defendant objects on confrontation grounds, arguing that if this testimony is to be admitted, the defendant is entitled to examine (1) a clockmaker to determine if the gears and levers in the clock were working properly so that the clock could measure time correctly, and (2) the person who last set the clock to determine if the clock was set for the correct time. The gears and levers in the clock mechanism move to produce an output that consists of the hands of the clock being in a particular position. This is analogous to the CODIS computer program that generates "hits" and the statistical probabilities that are the output of the database. The person who last set the clock and thereby entered the data (the then current time), which the gears and levers

of the clock manipulate to determine the time at a later event, is analogous to the California official who entered Elkins' DNA into the system.

*Appleby* makes clear that neither is the product of a testimonial declaration. Elkins would require the production of the person who set the clock before the admission of testimony about the time. In oral argument, his appellate counsel conceded that this would be Elkins' position in this analogous situation. Why stop there? By what standard did the clock-setter set the clock? We had better get testimony about the reference clock used to set the clock as well, maybe going back to the United States Master Clock maintained by the United States Naval Observatory.

The court in *Appleby* recognized "the database and the statistical program are accepted sources of information generally relied on by DNA experts." 289 Kan. at 1058. We conclude that the right of confrontation does not extend to the person who entered Elkins' DNA profile in the CODIS database.

Elkins' reliance on *State v. Laturner,* 289 Kan. 727, is unfounded. In *Laturner,* our Supreme Court held that K.S.A. 22-3437 violated the Confrontation Clause because the statute allowed the State to introduce into evidence a certified KBI drug analysis report without calling the analyst to testify. The court found that the reports contained assertions of fact by trial witnesses who normally would be required to testify as to their conclusions. The drug analysis certificates were therefore " 'functionally identical to live, in-court testimony, doing "precisely what a witness does on direct examination." ' " 289 Kan. at 734.

In our case, the declaration that Elkins claims to be testimonial is the report of the CODIS database that there is a "hit." There is no suggestion that this is the functional equivalent of the live testimony of the California official. No one has ever claimed that the California official would, or could, testify that there was a "hit" between Elkins' DNA profile and the profile of some other entry in the CODIS database. That was the work of CODIS. Schueler, who testified to the "hit," was in court and available for cross-examination. *Laturner* does not apply.

Further, even if the right of confrontation extended as far as Elkins claims, he fails to show how he was harmed by the inability to cross-examine the unknown California official. Detective Flachsbarth testified about collecting a DNA sample from Elkins and returning it to Schueler at the KBI, who testified about extracting the DNA sample and confirming that it matched DNA already collected. Both Flachsbarth and Schueler were available for cross-examination. Elkins chose not to cross-examine Flachsbarth but extensively cross-examined Schueler. Elkins questioned Schueler about possible contamination, but she explained that the contamination did not affect the accuracy of her analysis. Elkins' expert, Stetler, opined that Schueler might have cross-contaminated the J.L. and E.L. samples with DNA from another source. Elkins fails to show that this defense had anything to do with the collection of Elkins' DNA in California. The jury resolved the battle of the experts in favor of the State. Elkins fails to suggest how the outcome would have been any different had Schueler's statement about the CODIS "hit" not been received into evidence.

We find no error by the district court in admitting testimony that a CODIS "hit" occurred.

*Pretrial Discovery Requests*

Elkins claims the State failed to turn over vital discovery before trial. He requested documentation regarding the contamination incident, and the State apparently turned over all the KBI documents it possessed before trial. However, during Schueler's testimony, she referred to previously undisclosed handwritten notes on the envelope which contained E.L.'s contaminated DNA slides in testifying that the contamination likely occurred in 1996. Elkins moved for a mistrial. The trial court denied the motion.

Elkins argues that failing to disclose the envelope notes warranted a mistrial because his DNA expert, Stetler, testified that his review of the 1996 analysis of the material in E.L.'s case revealed neither Elkins' DNA nor evidence of contamination. Stetler concluded that any contamination must have occurred in 2004 when the material was tested again because Schueler handled the J.L. and E.L. material on the same day in 2004. Because Schueler's

1996 notes contradicted Stetler's cross-contamination conclusions, Elkins argues that the State's failure to disclose the notes undermined his theory of defense. He concludes that it was an abuse of discretion for the district court to deny his motion for a mistrial under these circumstances.

Elkins overstates the effect of Schueler's notes on Stetler's testimony. Schueler justified her assertion that she contaminated E.L.'s slides in 1996 by relying on notes she had written on the evidence envelope. However, Elkins' expert opined that Schueler must have caused the contamination in 2004, not in 1996, notwithstanding the envelope notation in 1996. Schueler's note in 1996 did not undermine Stetler's theory that Schueler contaminated the E.L. slides with material from the J.L. case in 2004, and he offered a rebuttal to Schueler's claim that she had examined the slides in 1996. We find no abuse of discretion in the court's denial of a mistrial with respect to this evidence.

*Offender Index*

As noted earlier, in her testimony Schueler stated that Elkins' DNA profile showed up on the "offender index" in the CODIS database. Elkins argues that this constituted K.S.A. 60-455 evidence of other crimes. Further, the district court failed to provide a limiting instruction to the jury regarding how this evidence could be used.

Schueler testified that the profile from the J.L. case hit to a "sample" in the CODIS "offender index." She then clarified that the CODIS hit was an investigative lead. The name associated with that lead was Cory Elkins, and she forwarded that lead to Lawrence detectives so they could collect Elkins' DNA for further testing. Schueler was never asked to explain what the offender index was or how or why a sample would be included in the index. There was no testimony that the index was limited to persons who were perpetrators of crimes. The jury was not told that Elkins had a criminal history.

The reference to an offender index was an isolated event that was never repeated in the trial. We find no abuse of discretion in the district court not granting a mistrial for this bit of testimony.

Because no limiting instruction was requested, we apply the clear error standard to the failure to give a limiting instruction. Given the substantive evidence regarding Elkins' DNA, we conclude that the failure to give a limiting instruction did not alter the outcome of the trial. See *State v. Hebert*, 277 Kan. 61, 96, 82 P.3d 470 (2004).

*Prosecutorial Misconduct*

Next, Elkins claims that in cross-examining Stetler, the prosecutor improperly attempted to shift the burden of proof to the defendant when the prosecutor asked Stetler whether he had attempted to conduct retesting to confirm his results.

We fail to see any merit in this claim. Nothing about the exchange between Stetler and the prosecutor involved burden shifting. Stetler suggested that the best practice for DNA testing was to double-check results, and he testified that the State did not follow this best practice. In cross-examination the prosecutor asked Stetler to admit that he did not follow his own best practice recommendation. Stetler explained that he did not follow the practice he espoused because Schueler had already used up any DNA material he might have tested.

The trial court correctly concluded that the State conducted a proper cross-examination of Stetler. Moreover, since Stetler got the chance to explain how further testing was not possible, any claimed burden-shifting was completely harmless. We find no misconduct by the prosecutor and no error in the trial court's ruling.

*Cumulative Error*

Elkins claims that an accumulation of errors denied him a fair trial. We find no accumulation of errors upon which Elkins could predicate such a claim.

*Sentencing Errors*

Finally, relying on *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), Elkins claims his criminal history should have been submitted to the jury for its determination and that the jury also should have determined whether an upper grid box sentence was warranted. These claims have been resolved

by our Supreme Court contrary to Elkins' position in *State v. Johnson*, 286 Kan. 824, 851, 190 P.3d 207 (2008), and in *State v. Ivory*, 273 Kan. 44, 46, 41 P.3d 781 (2002). We are bound to follow these precedents. *State v. Merrills*, 37 Kan. App. 2d 81, 83, 149 P.3d 869, *rev. denied* 284 Kan. 949 (2007).

Affirmed.